**Woodrow RIGBY and Don Rigby,**
**Plaintiffs,**

v.

**Edgar B. MITCHELL, Victor P. Rasmussen and Ruel Evans, Review Committee of the Agricultural Adjustment Administration, Defendants.**

No. C-187-56.

United States District Court
D. Utah, Central Division.

June 26, 1957.

Milton A. Oman and Herschel J. Saperstein (of Draper, Sandack, Draper & Oman), Salt Lake City, Utah, for plaintiffs.

A. Pratt Kesler, U. S. Atty., Llewellyn O. Thomas, Asst. U. S. Atty. for the Dist. of Utah, Salt Lake City, Utah (Howard Rooney and J. B. Zimowski, Washington, D. C., on the brief), for defendants.

CHRISTENSON, District Judge.

Plaintiffs are operators of wheat farms in Northern Utah. They brought this action in order to obtain court review, authorized by 7 U.S.C.A. §§ 1365, 1366, of a determination by the Review Committee establishing wheat acreage allotments for their separate farms for the 1957 crop year. The facts are not in dispute, and they are recited in the pretrial order. The only question for determination is the validity of certain regulations issued by the Secretary of Agriculture in accordance with which the plaintiffs' quotas were fixed.

The fixing of these allotments was done as a part of the national program established by the Agricultural Adjustment Act of 1938, as amended, 7 U.S.C.A. § 1281 et seq. This, among other things, required the national acreage allotment, less reserve, to be apportioned by the Secretary among the several states, the acreage allotment for each state to be apportioned among the counties in the state, and the respective county allotments to be apportioned through local committees among individual farms, all in accordance with the standards established by Congress in keeping with the declared policy of the Act. Among the broad objectives of the Act was to regulate interstate and foreign commerce in cotton, wheat, corn, tobacco and rice to the extent necessary to provide an orderly, adequate and balanced flow of such commodities in such commerce through storage of reserve supplies, loans marketing quotas, parity prices and other means, 7 U.S.C.A. § 1282. The purpose of the Act in respect to wheat was to guard not only against surpluses, but against shortages as well. 7 U.S.C.A. § 1331.

With regard to the apportionment of county acreage allotments among individual farms, the Act provides as follows: (§ 1334)

"(c) The allotment to the county shall be apportioned by the Secretary, through the local committees, among the farms within the county on the basis of past acreage of wheat, tillable acres, crop-rotation practices, type of soil and topography. * * * *"

Provision is made for a national marketing quota for wheat whenever in any calendar year the Secretary determines that the total supply for the marketing year beginning in such calendar year will exceed the normal supply for such marketing year by more than 20 per cent. 7 U.S.C.A. § 1335. The "farm marketing quota" is defined in the Act as: (Id., § 1340(1))

"* * * the actual production of the acreage planted to wheat on the farm, less the normal production, or the actual production, whichever is the smaller, of that acreage planted to wheat on the farm which is in excess of the farm acreage allotment for wheat."

The normal production, or the actual production, whichever is the smaller, of such excess is called the "farm marketing excess" of wheat. For the purpose of this provision, "actual production" of any number of acres of wheat on a farm means the actual average yield of wheat for the farm times such number of acres. Id.

In the light of these relationships between farm acreage allotments and farm marketing quotas, the penalty provided in Section 1340(2) will be seen to apply as a sanction against disregard of farm acreage allotments:

"(2) During any marketing year for which quotas are in effect, the producer shall be subject to a penalty on the farm marketing excess of wheat. The rate of the penalty on wheat shall be 45 per centum of the parity price per bushel of wheat as of May 1 of the calendar year in which the crop is harvested."

The Act further provides in effect that in years for which quotas are approved, the Secretary may deny price support to non-cooperators who have produced farm marketing excesses. Id., § 1441(d) (5). However, it should be noted under the Act that all penalties may be postponed or avoided by storage of the farm mar-

keting excess, or the delivery of the farm marketing excess to the Secretary of Agriculture. Id., § 1340(3). Section 1376 provides that if and when the Secretary shall so request, it shall be the duty of the several United States attorneys in their respective districts under the direction of the Attorney General to institute proceedings to collect the penalties provided in the Act which are stated to be in addition to, and not exclusive of, any of the remedies or penalties under pre-existing law.

Thus, in keeping both with the policy of the Act and its specific provisions, it seems that control of the planting, growing and harvesting of wheat, in and of themselves, was not the purpose of Congress. Rather it was control of the marketing of wheat when such marketing might tend to frustrate the policy of the Act. When it would not tend to do so, it does not seem to be within the intent of Congress to impose penalties.

This suit involves a determination of the validity of provisions of Section 728.716 of the regulations of the Secretary of Agriculture with reference to farm acreage allotments for 1957 crop wheat. Title 7, Ch. VII, C.F.R., published in the Federal Register, March 28, 1956 and May 15, 1956. 21 F.R. 1895. The entire regulation is important and must be considered, but it seems sufficient for the purpose of this determination to quote the following extracts:

"§ 728.716. Determination of base acreages for old farms. The county committee shall determine a base acreage for each old farm which will reflect the factors of past acreage of wheat, tillable acres, crop-rotation practices, type of soil, and topography. Each base acreage determined shall be fair and equitable when compared with the base acreage for all other farms in the county. In arriving at the base acreage, consideration shall be given to the wheat acreage on the farm during the years 1952 through 1955 where available, tillable acres, type of soil, topography, the producers'

crop-rotation system for the farm, including the equipment and other facilities available for carrying out such system of crop-rotation, and the base acreages for other farms in the community which are similar with respect to tillable acres, types of soil, and topography, and which are similarly operated. Such base acreages shall be established as follows:

"(a) With prior approval of the State committee, the 1956 base acreage, or the 1955 base acreage if appropriate for 1957 due to the crop-rotation system established for the farm, determined for the farm under the regulations issued by the Secretary for establishing farm acreage allotments for the respective years (19 F.R. 3250; 20 F.R. 1632) may be used as the 1957 base acreage for the farm if the county committee determines that such use will result in a base acreage for 1957 which meets the requirements prescribed above.

"(b) Historical average acreage: (1) If the 1957 base acreage is not established under paragraph (a) of this section the county committee shall establish for each farm a historical average acreage which shall be the average of the wheat acreages on the farm for 1952, 1953, 1954 and 1955. * * *

"(2) The acreage for 1955 shall be the 1955 wheat acreage plus the acreage diverted under the 1955 wheat acreage allotment program and shall be determined as follows: (i) If the 1955 farm wheat acreage allotment established under paragraph § 728.517 of the 1955 farm wheat acreage allotment regulations (19 F.R. 3250), as increased or decreased under § 728.518 of said regulations, was knowingly exceeded, the acreage for 1955 shall be the farm wheat acreage allotment plus the wheat acreage in excess of the farm wheat acreage allotment, less the acreage for Durum Wheat Class

II as determined under § 728.529 of said regulations (20 F.R. 1508); (ii) if the applicable farm wheat acreage allotment established under § 728.517, as increased or decreased under § 728.518, of said regulations was not knowingly exceeded and the wheat acreage was 90 per centum or more of such allotment, the wheat acreage shall be the base acreage established for the farm under the applicable regulations; (iii) if the wheat acreage was less than 90 per centum of the farm wheat acreage allotment established under § 728.-517, as increased or decreased under § 728.518, of said regulations the acreage shall be the smaller of the farm base acreage or the acreage obtained by multiplying the wheat acreage by a diversion credit factor. In such cases, the diversion credit factor will be the reciprocal of a decimal fraction which is 90 per centum of the county proration factor as determined under said regulations. * * *"

On or about November 8, 1956, the defendants made and entered their determination fixing a base acreage figure for the production of wheat for the year 1957 on the Woodrow Rigby farm of 2,587 acres and on the Don Rigby farm of 1,-243 acres. The base acreage for the respective plaintiffs in the year 1955 was 2,960 and 1,352 acres. These reductions resulted from the committee's applying, as will be more fully seen hereinafter, a reduced base acreage for 1955 in accordance with the formula contained in subsection (b) of the above quoted regulation. In the year 1955, it is undisputed that Woodrow Rigby knowingly over-planted 285 acres of wheat and Don Rigby knowingly over-planted 352 acres of wheat. Based upon such over-planting there was imposed, pursuant to the penalty provisions of the basic Act quoted above, a cash penalty at the rate of 45 per cent of the parity price per bushel, part of which has already been paid and part of which must be paid before further sales of wheat from the 1955 crops,

unless the penalty is waived through approved storage in accordance with the Act.

It has been stipulated that the effect of the reduction in base acreages for 1957 upon the respective plaintiffs, economically and from a monetary standpoint under the Federal Soil Bank Program, and otherwise, is substantial.

The plaintiffs complain that in addition to such penalties provided by Congress the formula permitted for the computation of 1957 allotments based in part upon 1955 allotments as applied by the committee in their cases (1) creates a penalty for the knowing over-production of wheat in addition to the penalty provided by statute; (2) adds to and enlarges the basic statute under which the Secretary of Agriculture derives his authority; (3) is unreasonable and out of harmony with the declared purpose of the basic statute and (4) by failing to provide adequate standards, allows the county agriculture committee to arbitrarily and capriciously differ in their determination of said allotments between persons situated in similar circumstances. An analysis of the regulations as applied to the plaintiffs and in the light of the basic Act convinces me that plaintiffs' position must be sustained.

It should be noted that the base acreage for a particular farm and for a particular year has applied to it a factor (in 1957 that of 68.2 per cent) to bring the total allotments in connection with all other farms in the county to the aggregate figure allocated to the county. Bearing in mind the distinction between "base acreage", which is the allotment assigned to the farm before this factor is applied, and the "farm allotment" or "wheat acreage allotment", reference is now made to the application of the particular regulation under attack.

It is undisputed that the committee did not establish the 1957 base acreage under sub-division (a) of the regulation quoted above, but did so under sub-division (b) on the theory of historical average. The committee considered acreages for the years 1952, 1953, 1954 and 1955, but

fairly gave no weight to those years which involved reduced planting by reason of crop rotation. The year 1955 did not involve limited planting because of crop rotation, but did involve knowing over-production. This was considered and weighted strictly in accordance with sub-section (b) (2) of the regulation cited. Eliminating the reference therein to Durum Wheat Class II, not pertinent here, in practical application the sub-section means this:

If the plaintiffs had not knowingly exceeded their allotment and their production was at least 90 per cent of their 1955 allotment, the base allotment for that year would be considered as their 1955 acreage, for the purpose of computing the historical average for 1957. If, however, as was the case, the plaintiffs knowingly produced moderately more than their allotment, they are not given the benefit of their base figure for that year in computing 1957 allotments, but their actual acreage, which is less than their base but more than their allotment, is used. If, however, they had actually produced in 1955 a greater quantity of wheat in excess of their allotment, they could still count their actual acreage in making up the historical average for the purpose of 1957 and could thereby increase their 1957 allotment by increased over-production in 1955. Finally, if they so knowingly over-planted as to exceed their 1955 base allotment, they could, by such greatly excessive production, actually raise their 1957 allotment under the formula laid down in the regulations.

Consider the regulation on the basis of its application specifically to Woodrow Rigby as an example: His base acreage for 1955 was 2,960 acres. Under the regulation, for the purpose of determining historical averages, the committee could and did use his actual production (that is, his wheat allotment plus the excess acreage planted) which was 1,930 acres. Thus, the 1,930 acres is used in his case to make up the historical average for the 1957 allotment purposes rather than his actual base acreage of 2,960 acres which would have been used had he not

knowingly over-planted. This resulted in a reduction of his base acreage for 1957 from 2,960 to 2,587 acres, or 373 acres less than his previous base, which meant a reduction of 254 in the acreage allotment for 1957 after the county-wide factor above mentioned was applied. Had he not knowingly over-planted, he would have been entitled to have his base acreage of 2,960 acres considered as his acreage for 1955 in making up the historical average. Under the regulation he, in effect, was penalized for over-planting by the reduction of his 1957 allotment, in addition to being penalized by the monetary penalty provided by Congress. However, had he had excess production in 1955 of 1,030 acres rather than 285 acres, that excess still could be added to his 1955 allotment under the regulation for the purpose of computing his 1955 acreage to make up the historical average. Thus, by extremely excessive over-production he could preserve his full base, and if he wished to over-produce even more, he could actually raise his base for 1957 in conformance with the regulation.

Not only is such a regulation illogical and unreasonable, but it bears no relationship to the purposes Congress expressed. In fact, it runs directly contrary to the policy of Congress by putting a premium upon extremely heavy over-production and a penalty upon minor or nominal over-production.

The Government argues that it is reasonable to consider not the extent of the over-production but merely the fact that there was some over-production; on this basis, it seeks to justify the preference set-up in the regulation for those who over-produce in large quantities as against those whose over-production is minor. This argument emphasizes the obvious fact that the regulation is designed not to carry out the purposes of Congress but to penalize any supposed failure to cooperate without reference to the degree of such failure. But when Congress set up its penalty it was based upon the quantity of over-production and with a waiver for approved storage. The

special administrative penalty, under the regulation, strangely enough, increases in inverse ratio to the degree of the uncooperativeness!

Nor is it any answer to say that the committee could have proceeded under sub-paragraph (a) or could have weighted or adjusted its result under sub-paragraph (b) through the powers granted it in sub-paragraph (c). None of these things was done by the committee, which followed strictly the unreasonable formula laid down in sub-paragraph (b). It would not help the situation now for it to theoretically apply other factors to a determination under sub-section (b) when the vice of the formula therein provided would constitute the foundation of its re-determination.

Let it be granted, as the Government contends, that in determining whether such a regulation is consistent with law, we must apply a rule of decision similar to that which controls when an Act of Congress is assailed as not being within the powers conferred upon it by the Constitution, and that such a regulation should not be disregarded or annulled unless, in the judgment of the Court, it is plainly and palpably inconsistent with law. Boske v. Comingore, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846. Nonetheless, I have concluded that the regulation complained of falls within the latter category.

While adequate authority is cited both in plaintiffs' brief, and in some of the references contained in the Government's brief, to document this conclusion, it seems sufficient to rest it upon the foregoing analysis of the regulation itself rather than upon necessarily extended analyses of cases involving essentially different and, in some instances, less marked departures.

The review committee's determination should be vacated and set aside and the proceedings should be remanded to the review committee with directions to make a determination of plaintiffs' 1957 base acreage consistent with the views expressed in this opinion. Counsel for the plaintiffs are hereby directed to prepare for consideration and to serve upon the opposing parties a form of judgment to this effect, including such implementing provisions as may be considered necessary, such judgment to be settled on the Court's regular rule day, July 25, 1957, at the hour of 2 o'clock p. m.