**Peder MOE, Peder Moe, Jr., and Skulason Moe, a co-partnership, doing business under the firm name of Moe Farm, Plaintiffs,**

**v.**

**Alton WESEN, Clarence Ritter, and George Heide, in their official capacity as Local Review Committee under the Agricultural Adjustment Act of 1938, as amended, Defendants.**

**Civ. A. No. 186.**

United States District Court
D. Montana,
Billings Division.
March 6, 1959.

Berger, Stotesbury & Moe, Billings, Mont., for plaintiffs.

S. E. Paul and Rogers N: Robinson, Denver, Colo., Krest Cyr, U. S. Dist. Atty., Butte, Mont., Waldo N. Spangelo, Asst. U. S. Dist. Atty., Billings, Mont., for defendants.

JAMESON, District Judge.

This is an action under 7 U.S.C.A. § 1365 to obtain judicial review of plaintiffs' 1959 wheat acreage allotment.

Plaintiffs are wheat farmers in Roosevelt County, Montana. Defendants are the local review committee, established under the provisions of the Agricultural Adjustment Act of 1938 as amended (7 U.S. C.A. § 1281 et seq.), to whom the plaintiffs appealed the determination of their 1959 allotment by the Roosevelt County Agricultural Stabilization and Conservation Committee. The defendants affirmed the action of the county committee. The review committee has filed a transcript of the record and its findings of fact. Both parties have filed motions for summary judgment. 7 U.S.C.A. § 1366 provides that the review by the court is limited to questions of law and that findings of fact by the review committee, if supported by evidence, are conclusive.

Under the provisions of the Agricultural Adjustment Act, the Secretary of Agriculture is required to ascertain and proclaim each year a national acreage allotment for the next crop of wheat. 7 U.S.C.A. § 1332. The national acreage allotment is apportioned by the Secretary among the several states on the basis of the acreage seeded for the production of wheat for the ten preceding calendar years "(plus, in applicable years, the acreage diverted under previous agricultural adjustment and conservation programs)," with adjustment for abnormal weather conditions and trends in acreage (7 U.S.C.A. § 1334(a)). The state allotment is then apportioned by the Secretary on a similar basis among the counties in the state (7 U.S.C.A. § 1334(b)), and the allocation to the county is apportioned by the Secretary, through the local committees, among the farmers within the county, on the basis of "past acreage of wheat, tillable acres, crop-rotation practices, type of soil, and topography." 7 U.S.C.A. § 1334(c).

The Act also provides for a national marketing quota for wheat (7 U.S.C.A. § 1335(a)) and for farm marketing quotas (7 U.S.C.A. § 1340). During any marketing year for which quotas are in effect, the producer is subject to a penalty on his farm marketing excess (7 U.S. C.A. § 1340(2)), but the penalty may be postponed or avoided by storage or delivery of the excess to the Secretary of Agriculture (7 U.S.C.A. § 1340(3)).

The wheat acreage allotment for 1959 was determined, pursuant to the applicable regulations [1], by averaging the wheat history acreages for the four year base period consisting of the years 1954 through 1957, making an adjustment thereon [2], and multiplying the resulting figure by the county factor. This factor is determined by dividing the allotment available for distribution in the county by the total base acreage of all farms in the county.

The four-year historical acreage average, as adjusted, is termed the base acreage for the year. If a farmer complies with the program and plants only his allotted acreage of wheat, his wheat history acreage for that year will be his allotment plus acres diverted from production in compliance with agricultural adjustment and conservation programs. The acres so diverted are commonly referred to as "diverted acres" for which a complying farmer is entitled to "diversion credit." For a complier, the wheat history acreage and base acreage for any particular year are ordinarily the same. The regulations provide, however, that if a farmer knowingly overplants his allotment his wheat history acreage for that year is the actual wheat acreage planted.

It is undisputed that plaintiffs had a base acreage for the years in question of 2,412 acres, that they complied with the

[1]. Title 7, Chpt. VII, Part 728, C.F.R., 23 F.R. 1672.

[2]. "The county committee may further adjust the historical average or the adjusted average acreage, as the case may be, so as to make such acreage comparable with those acreages for other farms which are similar with respect to tillable acres, type of soil and topography, and which are similarly operated with respect to the rotation of crops, within the following limitations * * *." 7 C.F.R. § 728.917(c) (3).

The county committee raised plaintiff's historical average from 2,308 to 2,361 as it was "indicated by crop land."

program in 1954 and 1956, and that in 1955 and 1957 they intentionally overseeded. In 1955 and 1957 they stored and bonded all excess wheat, in accordance with the regulations issued pursuant to to 7 U.S.C.A. § 1340, and consequently have not incurred the farm marketing penalty.

The county committee, in determining plaintiffs' 1959 acreage allotment, used the base acreage of 2,412 for the years 1954 and 1956 and for the years 1955 and 1957 used the actual acreage which plaintiffs had planted to wheat, 2,152 and 2,-258 acres respectively. Applying the county factor of .683 resulted in an allotment of 1,612.6 acres for 1959. Plaintiffs contend that under 7 U.S.C.A. § 1334, as amended, the county committee should have used the base acreage instead of the actual acreage planted in the years 1955 and 1957 in determining the 1959 wheat allotment. If this had been done, plaintiffs' allotment for 1959 would have been 1,647.4 acres,—a difference of 34.8 acres.

The regulations for the 1958 allotment provided that in arriving at the base acreage, the wheat history acreage for the years 1953 through 1956 should be considered, but permitted the county committee in the alternative to use the 1957 base acreage where appropriate. During the period of 1953 through 1956, plaintiffs overseeded only one year, and the county committee used the 1957 base acreage in determining the 1958 allotment. This base was 2,412 acres. The county factor was .682, resulting in an allotment of 1,645 acres for 1958. The regulations as originally issued did not permit the county committee to carry over the 1958 base acreage in arriving at the 1959 allotment.

Plaintiffs' motion for summary judgment is based on three grounds: (1) that the decision of the defendant review committee is not supported by sufficient competent evidence; (2) that the decision fails to apply properly the provisions of Public Law 85–366 "so as to prevent the plaintiffs from being penalized as to their wheat acreage history and the wheat acreage allotment based thereon;" and (3) that the regulations of the United States Department of Agriculture under which the allotment was determined are invalid and not authorized by the Act of Congress.

The facts are undisputed, and there is substantial evidence to support defendant's findings. The questions for determination accordingly are (1) whether the regulations of the Secretary are valid; and (2) whether Public Law 85–366 is applicable in determining the 1959 allotment.

■ It is true, as plaintiffs contend, that an administrative officer may not establish regulations which are beyond the scope of his statutory authority. On the other hand, a regulation "should not be disregarded or annulled unless, in the judgment of the court, it is plainly and palpably inconsistent with law. Those who insist that * * * a regulation is invalid must make its invalidity so manifest that the court has no choice except to hold that the Secretary has exceeded his authority and employed means that are not at all appropriate to the end specified in the act of Congress." Boske v. Comingore, 1900, 177 U.S. 459, 470, 20 S.Ct. 701, 706, 44 L.Ed. 846. Nor is the court "a tribunal for relief from the crudities and inequities of complicated experimental economic legislation." Secretary of Agriculture v. Cent. Roig Co., 1950, 338 U.S. 604, 618, 70 S.Ct. 403, 410, 94 L.Ed. 381. "And with the wisdom, workability, or fairness, of the plan of regulation" the court has "nothing to do." Wickard v. Filburn, 1942, 317 U.S. 111, 129, 63 S.Ct. 82, 91, 87 L.Ed. 122. We are concerned here only with the questions of whether the regulations were authorized by Congress and whether the Acts of Congress were properly applied.

The regulations with respect to farm acreage allotments for the 1959 wheat crop contain the following: "The county committee shall establish for each farm a historical average acreage, which shall be the average acreage of the wheat history on the farm for 1954, 1955, 1956,

and 1957. \* \* \* The wheat history acreage for any farm for 1957 shall be the base acreage determined for the farm \* \* \* under the 1957 farm wheat allotment regulations \* \* \* except as hereinafter provided \* \* \*. If the 1957 farm acreage allotment was knowingly overplanted, the wheat acreage history for 1957 for the farm shall be the wheat acreage for the farm." 7 C.F.R. § 728.917(b), 23 F.R. 1672, March 11, 1958. The regulation also contains a reference to prior regulations which apply the same rule for 1955.

The authority, if any, for the regulations is found in the following statutes:

7 U.S.C.A. § 1375: "The Secretary shall prescribe such regulations as are necessary for the enforcement of this chapter."

7 U.S.C.A. § 1331: "\* \* \* The provisions of sections 1331–1339 of this title affording a cooperative plan to wheat producers are necessary in order to minimize recurring surpluses and shortages of wheat in interstate and foreign commerce, to provide for the maintenance of adequate reserve supplies thereof, and to provide for an adequate flow of wheat and its products in interstate and foreign commerce. The provisions hereof for regulations of marketings by producers of wheat whenever an abnormally excessive supply of such commodity exists are necessary in order to maintain an orderly flow of wheat in interstate and foreign commerce under such conditions." 7 U.S.C.A. § 1334(c): "The allotment to the county shall be apportioned by the Secretary, through the local committees, among the farms within the county on the basis of past acreage of wheat, tillable acres, crop-rotation practices, type of soil, and topography. \* \* \*"

Plaintiffs do not question the constitutionality of the Act, but argue that the regulation for determining the 1959 wheat allotment for their farm (7 C.F.R. § 728.917(b), supra) is not warranted by the Act.

In Rigby v. Mitchell, D.C.Utah, 1957, 152 F.Supp. 492, 497, Judge Christenson held that the regulation is "plainly and palpably inconsistent with law." In the companion and unreported cases of Johnson v. Bingham, No. 2077, and Fuhirman v. Bingham, No. 2078, in the United States District Court, District of Idaho, decided June 10, 1958, Judge Taylor expressed agreement with Rigby v. Mitchell. On the other hand, in Rigby v. Rasmussen, No. C–38–58, in the District of Utah, Judge Ritter, in findings of fact and conclusions of law, dated January 28, 1959, held that the "regulations are not violative of the Constitution and are authorized by the Act and are in all respects valid."

Both parties rely on Public Law 85–203 (Aug. 28, 1957, 71 Stat. 477) and Public Law 85–366 (April 4, 1958, 72 Stat. 78), amending 7 U.S.C.A. § 1334, relating to apportionment of acreage among farms. By reason of these amendments and the conflict in the authorities referred to above, it is important to consider the provisions of these statutes, their legislative history, and their effect upon the regulation in question. Rigby v. Mitchell was decided prior to the enactment of Public Laws 85–203 and 85–366, but the other cases were decided subsequent to their enactment.

The original provision for the apportionment of acreage among farms was: "(c) The allotment to the county shall be apportioned by the Secretary, through the local committees, among the farms within the county on the basis of tillable acres, crop-rotation practices, type of soil, and topography \* \* \*." Act of Feb. 16, 1938, 52 Stat. 53. By the Act of July 14, 1953 (67 Stat. 151), Congress added the factor of "past acreage of wheat." 7 U.S.C.A. § 1334(c).

In 1957, subsection (h) was added by 85–203, which provided: "(h) Notwithstanding any other provision of law, no acreage in the commercial wheat-producing area seeded to wheat for harvest as grain in 1958 or thereafter in excess of acreage allotments shall be considered in establishing future State, county, and farm acreage allotments. \* \* \*" 7

U.S.C.A. § 1334(h), 71 Stat. 477. This subsection was further amended in 1958 by 85–366, 72 Stat. 79, which provides in part: "For the purpose of establishing farm acreage allotments—(i) the past acreage of wheat on any farm for 1958 shall be the base acreage determined for the farm under the regulations issued by the Secretary for determining 1958 farm wheat acreage allotment   *   *   *."

By this provision in P.L. 85–366, Congress expressly recognized the regulations for determining 1958 wheat acreage allotments, which had been published on April 9, 1957. It is significant that these regulations prescribe the same method of determining base acreage which plaintiffs contend is invalid: that consideration be given to the wheat history acreage for the four years preceding the year in which the regulations are promulgated and that the wheat history acreage for 1955 and 1956 for farms seeding only their alloted acreage is the base acreage (allotment plus diverted acreage), whereas, for overseeded farms it is the actual acreage (allotment plus excess acreage).[3] Had Congress disapproved of this method of determining wheat history acreage, it seems unlikely that it would have specifically provided in 85–366 that the base acreage for 1958 was to be determined in that manner.

P.L. 85–203 provided that any acreage seeded to wheat in excess of allotments would not be considered in establishing future acreage allotments. The House Report on P.L. 85–366 stated that the bill "does not change this basic principle but does prevent its application to the 1958 crop because of the fact that farmers did not have notice of this change in the law at the time they voted on acreage allotments for 1958 nor even at the time they planted their winter-wheat crop.

"Public Law 85–203 became law on August 28, 1957. It was not until approximately 2 months later that interpretations of the law and regulations thereunder were made available to the county committees. By this time, winter wheat was already in the ground, so that the new law had the effect of 'changing the rules in the middle of the game.' This bill will substantially remedy that inequitable situation and keep the full effect of this provision of the 1957 act from being felt until the next crop year." H.R. No. 1497, 85th Cong. 2d Sess. 3 (1958), U.S.Code Cong. and Adm. News 1958, p. 2308.[4]

---

3. "  *   *   *  (i) If the 1956 farm wheat acreage allotment   *   *   *  was knowingly exceeded, the wheat history acreage for 1956 shall be the farm wheat acreage allotment plus the wheat acreage in excess of the farm wheat acreage allotment.   *   *   *"  7 C.F.R. § 728.816, 22 F.R. 2337. The regulations contain a similar provision for 1955. The 1958 regulations also provide: "(a) *Use of 1956 or 1957 base acreage.* With prior approval of the State Committee, the 1957 base acreage, or the 1956 base acreage if appropriate for 1958   *   *   *  may be used as the 1958 base acreage for the farm if the county committee determines that such use will result in a base acreage for 1958 which meets the requirements prescribed above." In determining plaintiffs' 1958 acreage allotment, the 1957 base acreage was used.

4. S.R. No. 1359, 85th Cong. also explains the amendment and reasons therefor, and includes the following: "Under existing law States, counties, and farms receive acreage-history credit for the acreage planted and the acreage diverted on farms which comply with their wheat-acreage allotments. Thus, assuming a farm with a base acreage (historic acreage counted in computing allotments) of 100 acres and an acreage allotment of 60 acres, the State, county, and farm would receive acreage history credit of 100 acres (60 acres planted and 40 acres diverted) if the farm planted its full allotment and no more. Up until this year States, counties, and farms have also received acreage history credit for the full acreage planted (but not for any acreage diverted) on farms exceeding their acreage allotments. Thus, if the same farm had planted 70 acres in 1957, the State, county, and farm would have received credit for 70 acres planted and no acres diverted. Or if the farm had planted 120 acres in 1957, the State, county and farm would have received credit for 120 acres. The State, county, and farm therefore lost

I find no suggestion in the legislative history of P.L. 85–203 or 85–366 that the regulation in question was not in conformity with the authorization granted by Congress. The amendments and legislative reports instead indicate a change in policy in the legislation itself and in effect constituted a ratification of the manner of determining the past acreage of wheat prescribed by the regulation.[5] Both the House and Senate reports on 85–366 expressly recognized the existing regulations and manifested an intention not to change the manner in which wheat acreage history for a particular year was determined subsequent to the time farmers had commenced seeding the crops.

▮ Aside from the recognition of the regulation by Congress in the legislative history of P.L. 85–203 and 85–366, was the regulation a reasonable exercise of the authority granted the Secretary under the Act? In my opinion, the granting of diversion credit at the farm level was a necessary and proper implementation of the statutory requirement to obtain compliance with the farm wheat acreage allotment. Had the Secretary provided by regulation for use of the actual wheat acreage in the computation of the historical average acreage for all farms, the result would have been a reduction in the wheat history of the compliers and an increase for non-compliers, thus placing a premium on overplanting. Moreover, since the county's share of the state and national allotment is a fixed

acreage, to be apportioned among all wheat farmers in the county, any increase in the allotment to one farm results in a decreased allotment for the remaining farms in the county. The use of a base acreage for all farms, regardless of compliance, would also result in penalizing the compliers. The regulation of the Secretary permitting the use of diversion credit in the case of compliers and actual acreage seeded in the case of non-compliers, constituted a reasonable attempt by the Secretary to effectuate the purposes of Congress within the statutory authority given him.[6]

The regulation ameliorated inequities inherent in the program to the extent that compliers were treated better than non-compliers, except where a farmer actually overseeded his base acreage, thereby raising his history. There is no evidence of overseeding in excess of the base acreage on the part of plaintiffs or other farmers in Roosevelt County. Even in the case of overseeding the base acreage, there is an equalizing factor in that the "county committee may further adjust the historical average * * * so as to make such acreage comparable with those acreages for comparable farms which are similar with respect to tillable acres, type of soil and topography, and which are similarly operated with respect to rotation of crops * * *" 7 C.F.R. § 728.917(c)(3). A maximum adjustment of 25 per cent can be made in this manner.[7]

history if the farm exceeded its allotment, but planted less than its base; and gained history if the farm exceeded its base."

5. This conclusion is substantiated by the fact that 7 U.S.C.A. § 1334 has been amended on five other occasions since Aug. 28, 1954 (68 Stat. 95, 69 Stat. 9, 70 Stat. 50, 70 Stat. 1117, 71 Stat. 10) which may indicate some measure of Congressional approval. Cf. Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 53, 76 S.Ct. 20, 100 L.Ed. 29; Helvering v. R. J. Reynolds Co., 1939, 306 U.S. 110, 115, 59 S.Ct. 423, 83 L.Ed. 536; Helvering v. Winmill, 1938, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52.

6. In Secretary of Agriculture v. Cent. Roig Ref. Co., 1950, 338 U.S. 604, 614, 70 S.Ct.

403, 408, 94 L.Ed. 381, the Court stated, "A variety of plans of allotment may well conform to the statutory standards. But choice among permissive plans is necessarily the Secretary's; he is the agency entrusted by Congress to make the choice."

7. Judge Christenson did not feel that this was a sufficient answer to the possibility that a non-complier might exceed the base acreage, in which event the regulation would in effect put a premium "upon extremely heavy over-production and a penalty upon minor or nominal over-production." Rigby v. Mitchell, supra [152 F.Supp. 496]. In spite of this possible inequity, I have concluded that the reg-

P.L. 85–203 was designed to remedy the inequities arising from overseeding. It was made applicable alike to state, county and farm acreage allotments. This in itself is important, in that it is necessary to keep the method of apportionment of acreage among farms within a county in relative conformity with the apportionment among the counties and states.

It is worthy of note also that Congress found it necessary to pass laws with respect to cotton, peanuts, rice and tobacco, similar to P.L. 85–203, providing that acreage harvested in excess of the allotment not be considered in establishing allotments for future years. 63 Stat. 673; 63 Stat. 1060; 64 Stat. 43; 69 Stat. 24, 7 U.S.C.A. §§ 1344, 1353, 1358, 1313. The separate legislation with respect to each commodity, over a period of nine years, again implies a recognition by Congress of the regulations issued by the Secretary. The problems arising from overseeding were met in each instance by amending the legislation. In the legislative history called to my attention in connection with all of these amendments, I find no suggestion that the regulation under the existing law was improper. On the contrary, the reports and debates indicate that Congress deemed legislation necessary to correct existing inequities.

Plaintiffs contend further that even if the regulation were valid, it is no longer applicable, and that the provisions of P.L. 85–366 should have been followed by the review committee in determining plaintiff's 1959 wheat allotment. The defendant review committee contends that 85–366 is applicable to the *wheat history credit* for 1959 in establishing allotments for future years, but not for the establishment of the 1959 *allotment*.

As set forth above, P.L. 85–203, approved August 28, 1957, provided in part that beginning with the 1958 crop, wheat planted in excess of the acreage allotment will not be counted in establishing future

acreage allotment or marketing quotas. P.L. 85–366 did not change this basic principle, but did prevent its application to the 1958 crop "because of the fact that farmers did not have notice of this change in the law at the time they voted on acreage allotment for 1958 nor even at the time they planted their winter wheat crop." House Report No. 1497, 85th Cong., U.S.Code Cong. and Adm. News 1958, p. 2308.

In addition P.L. 85–366, made a substantive change, upon which plaintiffs rely in support of their position. This portion of the amendment reads:

"* * * and (iii) the past acreage of wheat for 1959 and any subsequent year shall be the wheat acreage on the farm which is not in excess of the farm wheat acreage allotment, plus, in the case of any farm which is in compliance with its farm wheat acreage allotment, the acreage diverted under such wheat allotment programs: *Provided,* that for 1959 and subsequent years in the case of any farm on which the entire amount of the farm marketing excess is delivered to the Secretary or stored in accordance with applicable regulations to avoid or postpone payment of the penalty, the past acreage of wheat for the year in which such farm marketing excess is so delivered or stored shall be the farm base acreage of wheat determined for the farm under the regulations issued by the Secretary for determining farm wheat acreage allotments for such year, but if any part of the amount of wheat so stored is later depleted and penalty becomes due by reason of such depletion, for the purpose of establishing farm wheat acreage allotments subsequent to such depletion the past acreage of wheat for the farm for the year in which the excess was produced shall be reduced to the farm wheat acre-

ulation was authorized, particularly in view of the legislative history herein discussed, including the reports on P.L.

85–366, which was enacted subsequent to Judge Christenson's opinion.

age allotment for such year." 7 U.S. C.A. § 1334, 72 Stat. 78.

With respect to 1959 and subsequent years, in determining the "past acreage of wheat", the complier receives credit for his allotment plus the acreage diverted under the wheat allotment program, and the non-complier likewise receives credit for his base acreage, provided he either stores the excess or delivers it to the Secretary.[8]

■ It is significant that H.R. 1497 and S.R. 1359, relating to P.L. 85–366 are both entitled "Wheat Acreage History." Throughout both reports there are references to "acreage history." A letter from the Secretary to the Chairman of the House Committee on Agriculture, incorporated in H.R. 1497, supports legislative action which would "modify the existing provisions of law * * * to permit Public Law 85–203 to become fully effective with respect to wheat-acreage credit for 1959 and subsequent years which will be used in the establishment of future State, county and farm wheat acreage allotments, except for a producer who seeds wheat for harvest as grain in excess of a farm allotment and stores or delivers to the Secretary the farm-marketing excess, in which case he should be allowed credit for an acreage equal to his farm-base acreage of wheat * * *." A Department of Agriculture notice (Notice GR–446) sent to A.S.C.

State Committees interpreting the effect of P.L. 85–366 relating in part to "effect on 1959 allotments" contains this statement: "Since 1958 wheat acreage is not used in establishing allotments for 1959, the acreage devoted to wheat in 1958 will have no effect on the 1959 State, county or farm allotments. The first time that this new provision of law will have an effect on such allotments will be for the 1960 crop of wheat." Public Law 85–366 made no changes in the manner of determining wheat history acreages for 1957 and prior years which are currently used in determining 1959 allotments. Some of these years, if the present formula for a four-year history is continued, will be used in establishing allotments throughout the 1962 crop year. I cannot escape the conclusion that P.L. 85–366 relates to wheat-acreage history for 1959 and subsequent years and is not applicable to the establishment of the 1959 wheat allotment.

■ No application has been made for leave to adduce additional evidence and both sides have moved for a summary judgment. Under 7 U.S.C.A. § 1366, the case accordingly must be determined upon the original record of the hearing before the review committee. The court finds that the review committee's determination was in accordance with law and accordingly affirms its determination.

---

8. This change was explained in House Report No. 1497, 85th Cong. as follows: "The bill does make one substantive change in the law enacted last year (Public Law 85–203). It provides that if a farmer overplants his wheat allotment but stores the excess wheat as provided by the Agricultural Act of 1938 and markets it only pursuant to the provisions of that act, he will receive acreage credit for history purposes as though he were in compliance with his wheat-acreage allotment.

"This, too, will make for a more equitable application of the new and more stringent wheat-acreage law. In many parts of the country, particularly in those areas where weather conditions are such that a wheat crop is likely to be a total or partial failure, a number of farmers make a practice of overplanting their wheat allotments as a form of crop insurance. Excess wheat produced on the overallotment acreage is stored on the farm pursuant to the provisions of the 1938 act and is later marketed only when the farm allotment is underplanted or when weather conditions are such that a less than normal yield is obtained." U.S. Code Cong. and Adm.News 1958, p. 2308.