**Edmund HOLLSTEIN, Plaintiff,**

v.

**NEBRASKA STATE MARKETING QUOTA REVIEW COMMITTEE, also known as Review Committee; Leonard Modlin, Herluf Laursen and James J. Bunch, Members of said Committee, United States Department of Agriculture, Commodity Stabilization Service, and Nebraska Agricultural Stabilization and Conservation Committee, Defendants.**

**H. B. WELLNITZ, Plaintiff,**

v.

**NEBRASKA STATE MARKETING QUOTA REVIEW COMMITTEE, also known as Review Committee; Leonard Modlin, Herluf Laursen and James J. Bunch, Members of said Committee, United States Department of Agriculture, Commodity Stabilization Service, and Nebraska Agricultural Stabilization and Conservation Committee, Defendants.**

United States District Court D. Nebraska.

May 14, 1959.

Edmund Hollstein, Rushville, Neb., for plaintiffs.

William E. Morrow, Jr., Asst. U. S. Atty., Lincoln, Neb., for defendants.

VAN PELT, District Judge.

These two cases were brought to review the plaintiffs' wheat allotments for 1959. The Sheridan County Agricultural Stabilization and Conservation Committee established the wheat acreage allotments for the plaintiffs' farms. The plaintiffs were dissatisfied with the allotments granted, and took the matter for review before the review committee constituted pursuant to 7 U.S.C.A. § 1363.

The County Committee's determination was affirmed by the review committee. Plaintiffs, pursuant to 7 U.S.C.A. § 1365, brought action in the State courts for review of the review committee's determination. The defendants removed the case to this court pursuant to 7 U.S.C.A. § 1365, and 28 U.S.C.A. § 1441.

In the answers in both cases, the defendants requested that the proceedings be remanded to the review committee for further proceedings, pursuant to 7 U.S.C.A. § 1366, to receive further evidence and make further findings of fact and conclusions. The Court entered no such order, but additional proceedings were had and further findings and conclusions were entered. The Court will consider these findings and conclusions with the same effect as though they had been made pursuant to court order.

As provided in 7 U.S.C.A. § 1365, this action is against only the review committee. The action is therefore dismissed as to all defendants except the committee and members thereof.

In such cases, it should be noted at the outset that the court's review is "limited to questions of law, and the findings of fact by the review committee, if supported by evidence shall be conclusive." Title 7 U.S.C.A. § 1366.

Under conditions which are presently unnecessary to relate at length, the Secretary of Agriculture establishes a national wheat acreage. This national acreage is then allocated among the states on the basis of:

"the acreage seeded for the production of wheat during the ten calendar years immediately preceding the calendar year in which the national acreage allotment is determined (plus, in applicable years, the acreage diverted under previous agricultural adjustment and conservation programs) with adjustments for abnormal weather conditions and for trends in acreage during such period: * * *" 7 U.S.C.A. § 1334(a).

Once the state has received its allotment of acreage, these acres are divided among the counties in that state on the basis of:

"the acreage seeded for the production of wheat during the ten calendar years immediately preceding the calendar year in which the national acreage allotment is determined (plus, in applicable years, the acreage diverted under previous agricultural adjustment and conservation programs), with adjustments for abnormal weather conditions and trends in acreage during such period and for the promotion of soil-conservation practices: * * *" Id., subsection (b).

The allotment to the county is then apportioned by the Secretary through the local committees, among the farms within the county on the basis of:

"past acreage of wheat, tillable acres, crop-rotation practices, type of soil, and topography." Id., subsection (c).

There were raised several grounds on which the plaintiffs rely in support of their claim for an increased allotment. The one most strongly urged, and upon which most reliance is laid, is that the regulations for determining past historical acreage, are invalid, as not tending to effectuate the purposes of the Act.

In order to properly evaluate this charge, it will be necessary to examine the method used to establish the wheat allotment in the past several years. Since the allotment is merely a percentage of the "base", the Court is really concerned with the establishment of the base.

There were no wheat allotments in effect in 1952 or 1953. In determining the 1954 wheat base, the acreage of wheat actually planted in 1952 and 1953 was added up and divided by two. This provided the "historical acreage." Provision was made to adjust this by eliminating either or both of the years if they were not typical—for reasons such as flood, drought, crop failure or crop rotation program. Further adjustments could be made, based on cropland, tillable acres, type of soil, topography, crop-rotation system, and the 1951 wheat acreage, and the base was to be "fair and equitable as compared with the base acreage for all other farms in the county. * * *" 7 C.F.R. § 728.416 (18 F.R. 3162, June 3, 1953).

In determining the 1955 wheat base, the 1952 and 1953 historical average was again used. The same type of adjustments described above could be employed, and the Committee could also take "into consideration the wheat acreage for 1951, [and] and wheat acreage for 1954 (plus any acreage diverted from wheat under the 1954 program) where available * * *." 7 C.F.R. § 728.516 (—— F.R. —— June 3, 1954).

In determining the wheat base for 1956, the county committees were instructed:

"With prior approval of the State committee, the 1955 base acreage, or the 1954 base acreage if appropriate for 1956 due to the crop-rotation system established for the farm, determined for the farm under the regulations issued by the Secretary for establishing farm acreage allotments for the respective years (18 F.R. 3161; 19 F.R. 3250) may be used as the 1956 base acreage for the farm if the county committee determines that such use will result in a base acreage for 1956 which meets the requirements prescribed above."

The "requirements prescribed above" were the statutory factors, as implemented by the Secretary as follows:

"Each base acreage determined shall be fair and equitable when compared with the base acreages for all other farms in the county. In arriving at the base acreage, consideration shall be given to the wheat acreage on the farm during the years 1951 through 1954 and 1955 where available, tillable acres, types of soil, topography, the crop-rotation system for the farm, including the equipment and other facilities available for carrying out such system, and the base acreages for other farms in the community which are similar with respect to tillable acres, type of soil, and topography, and which are similarly operated." 7 C. F.R. § 728.616 (—— F.R. —— March 18, 1955).

As is readily observed, the county committees were in effect given a general policy statement and told that they could use the appropriate prior year's base for 1956, if it was in accord with that policy. In the two cases at bar, the county committee had averaged up the historical acreage of 1952–53, and had used that as the base, without adjustments, for both 1954 and 1955. In determining the 1956 base, they merely continued that figure by adopting the 1955 base.

The regulations did provide that if the appropriate prior year's base did not meet the policy requirements, the committee was to average the wheat acreages for 1952, 1953 and 1954 (making necessary adjustments along the lines established in making the 1954 base acreage determination). Acreage allotments were in effect for 1954, and a farm planting within its allotment was credited with both the acreage actually planted and the acreage diverted from planting, under the acreage allotment program. This diversion credit was the difference between the allotment and the base. However, if the allotment was knowingly exceeded in 1954, then the figure used was the allotment plus acreage in excess of allotment—i. e. the actual acreage. Ibid.

For 1957 and 1958, the regulations were in substance the same as for 1956. The committee was told that with State committee approval, the appropriate pri-

or year's base could be continued for 1957 and 1958, respectively, if such use would meet the policy factors mentioned. If a prior year's base was not used, then the average acreage for the prior four years would be the historical acreage, and with essentially the same adjustments described for 1954, would become the base acreage. For the past years in which acreage allotments were in effect, a farmer who planted within his allotment would get historical credit not only for the acres planted, but also for the acres diverted from wheat under the program. If the farmer knowingly planted over his allotment, he was credited for his total planted acreage. 7 C.F.R. § 728.716 (—— F.R. —— March 28, 1956); 7 C.F.R. § 728.816 (22 F.R. 2337, April 9, 1957).

In practice and effect, the Sheridan County Committee did not determine the farm base on the average past historical acreages, but continued the 1952–53 historical average from year to year, up to and including 1958. (The Court is aware that this is a generalization in regard to Wellnitz, because the total acreage within his farming unit fluctuated during this time, but the statement is accurate for the purposes of this discussion.) This apparently represented their determination each year that the prior year's base satisfied the requirements set out above.

On March 11, 1958, the regulations for determining the 1959 base were printed in the Federal Register, 23 F.R. 1672. That portion of prior regulations which had permitted continuing a prior year's base upon State committee approval, was omitted from these regulations. The local committee was instructed to find the historical average acreage for 1954, 1955, 1956 and 1957, without allowing diversion credit for years in which the allotment was knowingly exceeded. The average for these years was to be the historical average for 1959. (This again was subject to the type of adjustments mentioned for 1954 to arrive at the base acreage—but no such adjustments were made in either of these cases.) On May 22, 1958, an amendment was printed in the Federal Register which permitted the local committee, with State committee approval, to continue the base for 1958 (or 1957, depending on the crop rotation system in effect) to be the base for 1959, under the same conditions previously used—i. e., if such use would meet the policy requirements in determining base acreages. 23 F.R. 3511.

The plaintiffs allege that this amendment was not before the local committee, and that therefore the committee did not consider that they might again carry forward the base of the appropriate prior year. The record is not very satisfactory on this point, but it is clear that the review committee did in fact consider this amendment and specifically determined that use of the previous year's base would not meet the policy requirements of the statute as implemented by the regulation, and therefore refused to adopt the prior base.

It is thus clear that the base for 1959 was determined by averaging the historical acreage for 1954, 1955, 1956 and 1957 (except that the year 1954 was eliminated for Wellnitz for a reason not here material). No further adjustments were made.

Both Wellnitz and Hollstein had planted wheat in excess of their acreage allotment for 1955, and Hollstein had also exceeded his allotment for 1957. For those years, they were credited only for actual acreage—and were not given diversion credit. The base for each of those years had been established for Hollstein at 951 acres. In computing the 1959 historical average, he received credit for his acreage, plus credit for the acreage diverted in 1954 and 1956—in other words, the full base of 951 acres. But for 1955 and 1957, he received credit only for his actual planted acreage, being 727 and 680 acres, respectively. Thus, in averaging the four years, he received a historical average acreage for 1959 of only 827 acres, which was adopted without adjustments as the base acreage. This amounts to 124 less base acres

than the 951 which had been allotted to Hollstein annually, beginning in 1954. The Wellnitz computations are more complicated, but he also received a reduction in base acreage by reason of over planting his allotment in 1955.

Having determined that the historical average acreage was determined in accordance with the regulations, we turn to the plaintiffs' contention that the regulations which prescribe the formula are invalid as not being authorized by the statute.

Title 7 U.S.C.A. § 1375 grants authority to the Secretary in the following language:

"The Secretary shall prescribe such regulations as are necessary for the enforcement of this chapter."

The basic policy of the Act is stated in the Legislative Findings, Title 7 U.S.C.A. § 1331, as follows:

"The provisions of sections 1331–1339 of this title affording a cooperative plan to wheat producers are necessary in order to minimize recurring surpluses and shortages of wheat in interstate and foreign commerce, to provide for the maintenance of adequate reserve supplies thereof, and to provide for an adequate flow of wheat and its products in interstate and foreign commerce. The provisions hereof for regulation of marketing by producers of wheat whenever an abnormally excessive supply of such commodity exists are necessary in order to maintain an orderly flow of wheat in interstate and foreign commerce under such conditions."

■ While the policy to minimize both shortages and surpluses is mentioned in the statute, the Court will take judicial notice of the fact that the more important problem, at least in recent years, has been to minimize the surpluses. Plaintiffs contend that the effect of the regulation is to encourage overplanting and surpluses, and thus is contrary to the basic policy of the Act.

Resort to the facts of this case point up the plaintiffs' argument. In 1955, plaintiff Hollstein was determined to have a "base" of 951 acres. His allotment was 613 acres. Had he planted one acre over his allotment, he would not have been credited with diverted acreage under the program, and in determining his 1955 historical acreage in subsequent years, he would have gotten credit for 614 acres. Had he planted within his allotment he would get credit for both the actual planting, plus the diversion credit, or a total of 951 acres. Thus by overplanting one acre he loses "history" of 327 acres. In fact, for 1955, he planted 727 acres, being 114 acres over his allotment. For this actual acreage he received credit, and lost "history" in the amount of 224 acres, being the difference between 727 acres actually planted, and the 951 acres with which he would have been credited had he planted within his allotment. At this point, plaintiffs' argument takes on meaning. By overplanting one acre, he would lose 327 acres for "history" purposes. By overplanting 114 acres, he loses only 224 acres. The nature of the formula is such that if he would plant up to his actual base, he would lose no historical credit at all. And if he should grossly overplant and actually exceed his base, he would increase his historical average, and would begin to take wheat allotment away from those farmers who cooperated in the program and planted within their allotment. The plaintiffs contend that this type of formula does not reasonably tend to minimize recurring surpluses, but encourages farmers to plant beyond their base and thus actually encourages the production of surpluses. This argument, of course, ignores the fact that the overplanted farmer will still have to abide by marketing regulations in disposing of his wheat, and also that the overplanted farmer loses the effect of the mandatory price support program. See infra.

The case of Rigby v. Mitchell, D.C. Utah 1957, 152 F.Supp. 492, is the only reported case cited by counsel or discovered by the Court which is squarely on point. It supports the plaintiffs' con-

tention, and holds the regulation invalid for the reasons advanced by plaintiffs. The defendants have provided the Court with a copy of the case of Moe v. Wesen, Civ.No. 186, decided on March 6, 1959, by Judge Jameson for the District of Montana, Billings Division, 172 F.Supp. 259. This case supports the regulation, and notes that the Rigby case had been followed in two unreported cases in Idaho, but that Judge Ritter in the District of Utah where the Mitchell case was decided, had held that the regulations were valid in the case of Rigby v. Rasmussen, Civ.No. 38–58 (Jan. 28, 1959). A copy of the latter case was also provided.

At the outset, it appears that the plaintiffs have misconstrued the function of the Secretary in determining acreage allotments. They claim that they are being penalized in 1959 for overplanting in 1955 and 1957 when they did not know that such overplanting would reduce their future allotments.[1]

Nothing in the statute expressly gives the Secretary power to penalize overplanting by reducing future allotments. One penalty which results from overplanting is a cash penalty on the bushels of wheat produced on the excessive acreage in a year when marketing quotas are in effect. 7 U.S.C.A. § 1340. This penalty can be avoided by proper storage of the wheat or delivery of it to the Secretary. Ibid. It is actually contemplated that there will be overplanting of wheat, and provision is made so that wheat can be stored and subsequently marketed, without penalty, in a future year when the farmer plants less than his acreage allotment or has a crop failure. Id. subsection (6). Another penalty for overplanting is the loss of mandatory price supports by one who plants in excess of his allotment. This point is well stated on page 19 of the excellent brief furnished by the defendants:

"The price support provisions of the Act were originally contained in Sec. 302. 52 Stat. 43. Mandatory loans were required to be made by the Commodity Credit Corporation to cooperators. A cooperator was defined as a producer on whose farm the acreage planted to the commodity for the crop with respect to which the loan was made did not exceed the farm acreage allotment for the commodity established under the Act. 52 Stat. 44. Sec. 302 was repealed by the Agricultural Act of 1949, 63 Stat. 1051, and the price support provisions of that Act substituted therefor. The general plan of the statutory program was not changed, however, and mandatory price support was made available only to a cooperator who was defined as a producer on whose farm the acreage planted to the commodity did not exceed the farm acreage allotment for the commodity under Title III of the Agricultural Adjustment Act of 1938, as amended. 7 U.S.C. 1441, 1428(b). Under this program the farm of the cooperator

---

1. In 1955, both plaintiffs overplanted their allotment. By this action they failed to earn any diversion credit for their county or State. From the time this year was computed as history for future allotments (which would be the 1957 crop year) they caused a loss of allotment acreage to the State and county. In 1957, they could have quite properly (assuming the regulations are valid) have had their base and allotment reduced. In effect, by virtue of carrying forward the previous year's base from year to year, the County committee gave them credit for diverting acreage under the program when in fact they were not complying with the program by living within their allotment.

At the same time, because no diversion credit had been earned, the State and county suffered a reduction in what would otherwise have been their allotment. Instead of this reduction settling on those who caused the reduction of the State and county allotment, it was spread out over the other wheatgrowers as well as themselves. To that extent the plaintiffs received an advantage during 1957 and 1958. By actually computing the average historical acreage for the 1959 allotment, the reduction of State and county allotments caused by both plaintiffs in 1955 and by Hollstein in 1957 is placed on their own land.

must be in compliance with the farm allotment. If the farm is not in compliance the extent of noncompliance is not significant. Whether the farm be over planted one acre or 100 acres none of the wheat produced can be eligible for mandatory price support."

The very thrust of the plaintiffs' argument tends to demonstrate that the Secretary's regulations do not purport to establish a penalty system for overplanting. They establish an historical base, from which the allotment is determined. The statute requires that the Secretary take into account the "past acreage of wheat." 7 U.S.C.A. § 1334(c). If a farmer has not complied with his allotment, in a prior year, then, under the regulations, he is credited with what he actually planted. If he has complied with the allotment, then the Secretary has declared that he should be credited with the acres so diverted in addition to what he planted. As the plaintiffs point out, one could increase his allotment for future years by each year planting in excess of his base. It seems to the Court that this fact alone is very striking proof that the system employed is not designed as a penalty system. If it is a penalty, the "penalty" declines as the "offense" increases, and at a certain point of excessive violation there is no more "penalty" but a benefit instead. This is unlike any "penalty" with which this Court is acquainted. The Court is convinced that the regulations were not set up to impose a penalty for overplanting. The fact that plaintiffs suffer a loss due to regulation of the industry does not prove that the regulations were established to penalize those who exceeded their allotment.

The point as precisely stated on page 16 of the defendants' brief is "whether the statute permits the allowance of diversion credit at the farm level in any case, and if so whether the denial of diversion credit to a farm which is overplanted with respect to the allotment but underplanted with respect to the base, is a lawful implementation of the statute."

Title 7 U.S.C.A. § 1334(a) and (b) provide that as to the States and counties, the Secretary is to allot acreage on the basis "of the acreage seeded for the production of wheat during the ten calendar years immediately preceding the calender year in which the national acreage allotment is determined (*plus, in applicable years, the acreage diverted under previous agricultural adjustment and conservation programs*) * * *." (Emphasis supplied.) Subsection (c) of § 1334 provides for apportioning the county's allotment among the farms "on the basis of *past acreage of wheat*, tillable acres, crop-rotation practices, type of soil, and topography." (Emphasis supplied.) No mention is made of this diversion credit when apportioning the county allotment among the farms.

The diversion credit, however, with which a county or State is credited, can only be the sum of the total diversion credit attributable to each of the farms within that area. The Secretary has therefore deemed that in administering the act as a whole he will attribute to the farms which produced the diversion credit that went to make up the State and county allotments, that same credit when apportioning the county allotment back among the farms. This seems to the Court a perfectly reasonable exercise of the Secretary's power to administer the Act.

It may be pointed out that if the Secretary had not granted such diversion credit, the county would have for disposal the acres earned by the diversion credit attributable to the complying farm. This acreage would be available to those who had overplanted their allotment, and the farmer who complied with the allotment would get none of it, if no diversion credit were allowed and there were sufficient overplanting by others. The Court deems that the Secretary was justified in considering diversion credit when establishing the farm base.

We thus come to the question of whether it was within the range of the Sec-

retary's discretion to withhold any credit for acres diverted when the farmer planted over his allotment, but less than his base. This seems to be a result of the Secretary's having determined that one is either "under" the agricultural adjustment program or he is not. If he is "under" the program, he plants within his allotment and therefore gets his diversion credit. If he is not "under" the program, he plants without being confined by the allotment, and under the statutory direction to give credit for "past acreage of wheat", the Secretary gives credit for whatever amount the farmer decides to plant. If he planted over his base, then his operations represent a larger segment of national wheat production than in prior years, and he is given credit accordingly. If he plants less than his base (but over his allotment) his operations represent a smaller segment of national wheat production, and he is given credit accordingly.

The wheat quotas and their cash penalties tend to minimize the marketing of surplus wheat. The mandatory price support program tends to make it attractive to plant within allotment. There is nothing in the Act to indicate that the Secretary is to use the method for determining base acreage as a means of inducing the reduction of acreage, and by the same token, the fact that the method chosen to compute the base acreage does not tend to reduce overproduction does not render the regulation invalid. When Congress directed the Secretary to give weight to the past acreage of wheat, the "evil" of which the plaintiffs complain was inherent in that factor. Assume that no diversion credit was allowed to anyone. The person who planted within his allotment merely gets credit for those acres. One who plants over his allotment—by any amount—gets an increase in "history" which will increase his allotment in future years and take allotment away from those who comply. It can easily be said of this

factor that it does not tend to cut overproduction, that it is ill-considered, etc. But as the Supreme Court said in a Sugar Act case:

"Suffice it to say that since Congress fixed the quotas on a historical basis it is not for this Court to reweigh the relevant factors and, perchance, substitute its notion of expediency and fairness for that of Congress. This is so even though the quotas thus fixed may demonstrably be disadvantageous to certain areas or persons. This Court is not a tribunal for relief from the crudities and inequities of complicated experimental economic legislation." Secretary of Agriculture v. Central Roig Refining Co., 1950, 338 U.S. 604, 618, 70 S.Ct. 403, 410, 94 L.Ed. 381.

By granting diversion credit so as to credit the cooperator with the acres the Secretary deems he would have been planting in the absence of the Act, this constitutes a reasonable attempt to compute his acreage on a par with those who in fact are planting without being bound by the Act.

It should be noted in passing that the statute has now been amended and the formula dropped. Title 7 U.S.C.A. § 1334 now provides that the historic base for 1959 and future years will be, for the cooperator, the acreage allotment plus the acres diverted. If one exceeds his allotment, he gets credited only for his allotment; provided, however, that if the excess wheat is delivered to the Secretary or stored under conditions as to avoid a marketing penalty, then that farm will get credit for its base as established for that year.[2]

It is clear from the legislative history, that under the law and regulations as administered prior to the amendment, the effect had been to shift acreage allotments from areas complying with their allotments to areas which did not comply and which planted over their base. The

---

**2.** The 1958 base to be used for past history in future years was specifically set at the full base established under the Secretary's regulations for determining the 1958 base.

statute was amended to stop that process. H.Rept.No. 1497; S.Rept.No. 1359, 85th Cong. 2d Session.

■■ The plaintiffs have suggested a plan for computing historical acreage which they claim to be more fair than the Secretary's. Doubtless a great number of possible formulae could be devised. As the Supreme Court stated in the Roig Refining case: "A variety of plans of allotment may well conform to the statutory standards. But the choice among permissive plans is necessarily the Secretary's; he is the agency entrusted by Congress to make the choice." 338 U.S. at page 614, 70 S.Ct. at page 408. In this case, it is the Court's opinion that the regulation at hand constitutes a reasonable attempt by the Secretary to effectuate the purposes of Congress within the framework of authority given him. The Court finds the regulation valid.

The Review Committee found that under the regulations it would not meet the requirements of the regulations to use either the 1957 or 1958 base as the base for 1959. Insofar as this appeal is concerned, the Review Committee also found that the facts of neither case justified a further adjustment in the historical average acreage in reaching the base acreage, under the regulations.

The Court has reviewed the evidence presented to the Review committee in both cases, and with one exception finds that the findings of that Committee should be affirmed. The exception refers to the 1956 crop year for Wellnitz and to what is referred to as the "Nydahl Estate land." The Court is aware that plaintiffs did not raise this point too clearly, but the interests of justice demand that it be re-examined.

The Review Committee in paragraphs IV and V made the following findings:

"IV.

"In the fall or winter of 1955–1956, after time for the seeding of the 1956 winter wheat crop, H. B. Wellnitz became the operator of land known as the Nydahl Estate, con-sisting of 2,296 acres of which 450 acres were cropland. A base wheat acreage of 150 acres and a wheat acreage allotment of 96 acres had been established for this farm for the wheat crop year 1956. This tract was combined as a part of the H. B. Wellnitz farming unit in the records of the County A.S.C. Committee but since those records showed no wheat acreage on this tract in the wheat crop year 1956, no diversion credit was earned as to such tract, and the wheat history acreage for the H. B. Wellnitz farm for 1956 was determined by the County Committee to be 903 acres, being the acreage seeded to wheat, plus diversion credit on the 3,840 acres of land operated by H. B. Wellnitz, not including the Nydahl Estate land. H. B. Wellnitz seeded 491 acres of winter wheat on the 3,840 acre tract and was in compliance with the 494 acre allotment established for such tract.

"V.

"For the wheat crop year 1956 H. B. Wellnitz testified that he seeded 90 to 96 acres of Abner Durham spring wheat on the Nydahl Estate land in May of 1956. The records of the Sheridan County A.S.C. Committee contain no evidence that wheat was seeded on this tract for harvest in 1956 and an inspection report dated March 22, 1956 indicates that there was no wheat at that time. The office manager for the county committee and the acreage allotment and marketing quota clerk testified that they had no knowledge that there was wheat produced on the Nydahl Estate land in 1956. It is found as a fact that there was no wheat acreage on the Nydahl Estate land in 1956. Had there been 90 to 96 acres of wheat seeded on said land for harvest in 1956 the wheat history acreage for that year for the H. B. Wellnitz farm would have been 1,053 acres."

The Court in reviewing the record is not satisfied with the evidence. Wellnitz repeatedly and directly claimed he had planted the allotment for this land. The inspection report referred to above was made in March of 1956, and Wellnitz says he planted the wheat in May. The only other evidence is that there is no record of the wheat in the County office. Surely there must be more evidence on this point. Someone must have helped to harvest the wheat if there was any. If this land is in fact part of an "estate", there must be an administrator's or executor's record, or at least a recollection of whether there was wheat on this ground. The Court finds that the Review Committee's findings on this point lack support in the evidence, and remands the matter to the committee for a further determination on this one specific point.

The original of this memorandum will be entered in file Civ. 194 L, and a copy will be entered in file Civ. 193 L. An appropriate order in each case will this day be entered.