## SECRETARY OF AGRICULTURE *v*. CENTRAL ROIG REFINING CO. ET AL.

NO. 27.

Argued October 17, 1949.—Decided February 6, 1950.

*Neil Brooks* argued the cause for the Secretary of Agriculture, petitioner in No. 27 and respondent in No. 32. With him on the brief were *Solicitor General Perlman, Joseph W. Bishop, Jr., W. Carroll Hunter* and *Lewis A. Sigler.*

*Orlando J. Antonsanti* argued the cause for the Porto Rican American Sugar Refinery, Inc., petitioner in No. 30 and respondent in No. 27. With him on the brief were *Arthur L. Quinn* and *Gordon Pickett Peyton.*

*José Trías Monge,* Assistant Attorney General, and *Walton Hamilton* argued the cause for Puerto Rico, petitioner in No. 32 and respondent in No. 27. With them on the brief were *Vicente Geigel Polanco,* Attorney General, and *Thurman Arnold.*

*Frederic P. Lee* argued the cause for the Central Roig Refining Co. et al., respondents. With him on the brief was *Noel T. Dowling.*

*Donald R. Richberg* argued the cause and filed a brief for the American Sugar Refining Co. et al., respondents.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

These three cases bring before us the validity of an order of the Secretary of Agriculture, issued by him on the basis of the Sugar Act of 1948. It is claimed that the Secretary disobeyed the requirements of that Act. If it be found that the Secretary brought himself within the Act, the power of Congress to give him the authority he exercised is challenged. By a series of enactments Congress addressed itself to what it found to be serious evils

resulting from an uncontrolled sugar market. The central aim of this legislation was to rationalize the mischievous fluctuations of a free sugar market by the familiar device of a quota system. The Jones-Costigan Act of 1934, 48 Stat. 670, the Sugar Act of 1937, 50 Stat. 903, and the Sugar Act of 1948, 61 Stat. 922, 7 U. S. C. (Supp. II, 1949) §§ 1100–60.

The volume of sugar moving to the continental United States market was controlled to secure a harmonious relation between supply and demand.[1] To adapt means to the purpose of the sugar legislation, the Act of 1948 defines five domestic sugar-producing areas: two in the continental United States and one each in Hawaii, Puerto Rico and the Virgin Islands. To each area is allotted an annual quota of sugar, specifying the maximum number of tons which may be marketed on the mainland from that area. § 202 (a). A quota is likewise assigned to the Philippines. § 202 (b). The balance of the needs of consumers in the continental United States, to be determined each year by the Secretary, § 201, is met by importation from foreign countries, predominantly from Cuba, of the requisite amount of sugar. § 202 (c).

The quotas thus established apply to sugar in any form, raw or refined. In addition, § 207 of the Act establishes fixed limits on the tonnage of "direct-consumption" or refined sugar [2] which may be marketed annually on the mainland from the offshore areas as part of their total

---

[1] In the course of this opinion all expressions of an economic character are to be attributed to those who have authority to make such economic judgments—the Congress and the Secretary of Agriculture—and are not to be deemed the independent judgments of the Court. It is not our right to pronounce economic views; we are confined to passing on the right of the Congress and the Secretary to act on the basis of entertainable economic judgments.

[2] With minor exceptions not relevant here, the term "direct-consumption" sugar in the Act refers to refined sugar.

sugar quotas. But mainland refiners are not subject to quota limitations upon the marketing of refined sugar.

The Puerto Rican quota for "direct-consumption" sugar is 126,033 tons. This figure had its genesis in the Jones-Costigan Act of 1934, which provided that the quota for each offshore area was to be the largest amount shipped to the mainland in any one of the three preceding years. 48 Stat. 670, 672–73. In the case of Puerto Rico this was computed by the Secretary at 126,033 tons. General Sugar Quota Regulations, Ser. 2, Rev. 1, p. 4, August 17, 1935. By the Sugar Acts of 1937 and 1948, Congress embedded this amount in legislation. All the details for the control of a commodity like sugar could not, of course, be legislatively predetermined. Administrative powers are an essential part of such a regulatory scheme. The powers conferred by § 205 (a) upon the Secretary of Agriculture raise some of the serious issues in this litigation. By that section Congress authorized the Secretary to allot the refined sugar quota as well as the inclusive allowance of a particular area among those marketing the sugar on the mainland from that area.[3] The section provides that "Allotments shall be

---

[3] The full text of § 205 (a) is as follows:

"Whenever the Secretary finds that the allotment of any quota, or proration thereof, established for any area pursuant to the provisions of this Act, is necessary to assure an orderly and adequate flow of sugar or liquid sugar in the channels of interstate or foreign commerce, or to prevent disorderly marketing or importation of sugar or liquid sugar, or to maintain a continuous and stable supply of sugar or liquid sugar, or to afford all interested persons an equitable opportunity to market sugar or liquid sugar within any area's quota, after such hearing and upon such notice as he may by regulations prescribe, he shall make allotments of such quota or proration thereof by allotting to persons who market or import sugar or liquid sugar, for such periods as he may designate, the quantities of sugar or liquid sugar which each such person may market in continental United States, the Territory of Hawaii, or Puerto Rico, or may import or bring into continental United States,

made in such manner and in such amounts as to provide a fair, efficient, and equitable distribution of such quota or proration thereof, by taking into consideration" three factors: (1) "processings of sugar . . . to which proportionate shares . . . pertained";[4] (2) past marketings; and (3) ability to market the amount allotted.

On January 21, 1948, the Secretary issued Puerto Rico Sugar Order No. 18, 13 Fed. Reg. 310, allotting the 1948 Puerto Rican refined sugar quota among the various refineries of the island. Having satisfied himself of the need for an allotment, the Secretary, in conformity with the procedural requirements of § 205 (a), apportioned the quota among the individual refiners, setting forth in appropriate findings the manner in which he applied the three statutory standards for allotment.

As to "past marketings" he found that the proper measure was the average of the highest five years of marketings during the seven-year period of 1935–1941. While

---

for consumption therein. Allotments shall be made in such manner and in such amounts as to provide a fair, efficient, and equitable distribution of such quota or proration thereof, by taking into consideration the processings of sugar or liquid sugar from sugar beets or sugarcane to which proportionate shares, determined pursuant to the provisions of subsection (b) of section 302, pertained; the past marketings or importations of each such person; and the ability of such person to market or import that portion of such quota or proration thereof allotted to him. The Secretary may also, upon such hearing and notice as he may by regulations prescribe, revise or amend any such allotment upon the same basis as the initial allotment was made." 61 Stat. 926, 7 U. S. C. § 1115.

[4] To help effectuate the marketing controls, § 301 of the Act provides that certain payments will be made to farmers only if they limit the marketing of sugar cane or beets grown on their farms to a "proportionate share" of the quantity necessary to fill the area's quota, plus a normal carry-over. The relevance of this provision here is that processings of sugar grown within the "proportionate share" restriction are one of the three factors to be considered by the Secretary in the making of allotments under § 205 (a).

recognizing that ordinarily the most recent period of marketings furnished the appropriate data, he concluded that the period 1942–1947 was unrepresentative in that the war needs made those years abnormal and not a fair basis for purposes of the economic stabilization which was the aim of the 1948 Act. Shortages as to transportation, storage and materials, caused by the war, led to special government control. These circumstances resulted in hardships or advantages in varying degrees to different refiners, quite unrelated to a fair system of quotas for the post-war period.

Likewise as to "the ability . . . to market," the Secretary recognized that marketings during a recent period ordinarily furnished the best measure. But again he found that the derangements of the war years served to make that measure abnormal. He therefore concluded that a fairer guide to his judgment came from the highest marketings of any year during the 1935–1947 period, using, however, present plant capacity as a corrective.

The Secretary duly considered "the processings of sugar" to which proportionate shares pertained, but concluded that this factor could not fairly be applied. This was so because it referred to processings of raw sugar from sugar cane, whereas the three largest Puerto Rican refining concerns restricted themselves to refining raw sugar after it had already been processed. He felt bound, therefore, to give no weight to this factor in the sum he finally struck, and gave equal weight to past marketings and ability to market.

Availing themselves of § 205 (b), respondents, Central Roig Refining Company and Western Sugar Refining Company, two of the three largest refiners in Puerto Rico, appealed from the Secretary's order to the Court of Appeals for the District of Columbia. They charged the Secretary with disregard of the standards which Congress imposed by § 205 (a) for his guidance in making

allotment of quotas; they challenged the validity of the Act itself under the Due Process Clause of the Fifth Amendment. Porto Rican American Sugar Refinery, Inc., petitioner in No. 30, the largest of the Puerto Rican refiners, intervened to defend the Secretary's order against the statutory attack. The Government of Puerto Rico, petitioner in No. 32, intervened to urge the unconstitutionality of the statute, while the American Sugar Refining Company and other mainland refiners intervened to meet this attack. Being of opinion that the Secretary's order was not authorized by the Act, the Court of Appeals reversed it. 84 U. S. App. D. C. 161, 171 F. 2d 1016. Since the order failed on statutory grounds, a majority of that court did not deem it proper to decide the constitutional question. Because of the obvious importance of the decision below in the administration of the Sugar Act we granted certiorari. 336 U. S. 959.

I. In making quota allotments the Secretary of Agriculture must of course keep scrupulously within the limits set by the Sugar Act of 1948. In devising the framework of control Congress fixed the flat quotas for the sugar-producing areas. Congress could not itself, as a practical matter, allot the area quotas among individual marketers. The details on which fair judgment must be based are too shifting and judgment upon them calls for too specialized understanding to make direct congressional determination feasible. Almost inescapably the function of allotting the area quotas among individual marketers becomes an administrative function entrusted to the member of the Cabinet charged with oversight of the agricultural economy of the nation. He could not be left at large and yet he could not be rigidly bounded. Either extreme would defeat the control system. They could be avoided only by laying down standards of such breadth as inevitably to give the Secretary leeway for his expert judgment. Its exercise presumes

a judgment at once comprehensive and conscientious. Accordingly, Congress instructed the Secretary to make allotments "in such manner and in such amounts as to provide a fair, efficient, and equitable distribution" of the quota.

In short, Congress gave the Secretary discretion commensurate with the legislative goal. Allocation of quotas to individual marketers was deemed an essential part of the regulatory scheme. The complexity of problems affecting raw and refined sugar in widely separated and economically disparate areas, accentuated by the instability of the differentiating factors, must have persuaded Congress of the need for continuous detailed administrative supervision.[5] In any event, such is the plain purport of the legislation.

By way of guiding the Secretary in formulating a fair distribution of individual allotments, Congress directed him to exercise his discretion "by taking into consideration" three factors: past marketings, ability to market, and processings to which proportionate shares pertained. Plainly these are not mechanical or self-defining standards. They in turn imply wide areas of judgment and therefore of discretion. The fact that the Secretary's judgment is finally expressed arithmetically gives an illusory definiteness to the process of reaching it. Moreover, he is under a duty merely to take "into

---

[5] With respect to the Secretary's comparable function of fixing proportionate shares for farms under § 302 of the Act, the House Committee on Agriculture stated: "In view of the differences in conditions of production obtaining in the various sugar-producing areas, the committee has not attempted to specify the exact manner in which the Secretary shall use production history. It is the judgment of the committee that considerable discretion should be left to the Secretary to deal with the varied and changing conditions in the various producing areas, in order to establish fair and equitable proportionate shares for farms in such areas." H. R. Rep. No. 796, 80th Cong., 1st Sess. 8.

consideration" the particularized factors. The Secretary cannot be heedless of these factors in the sense, for instance, of refusing to hear relevant evidence bearing on them. But Congress did not think it was feasible to bind the Secretary as to the part his "consideration" of these three factors should play in his final judgment—what weight each should be given, or whether in a particular situation all three factors must play a quantitative share in his computation.

It was evidently deemed fair that in a controlled market each producer should be permitted to retain more or less the share of the market which he had acquired in the past. Accordingly, past marketings were to be taken into consideration in the Secretary's allotments. But the past is relevant only if it furnishes a representative index of the relative positions of different marketers. And there is no calculus available for determining whether a base period for measurement is fairly representative. Whether conditions have been so unusual as to make a period unrepresentative is not a matter of counting figures but of weighing imponderables. If he is to exercise the function of allotting a limited supply among avid contenders for it, the Secretary cannot escape the necessity of passing judgment on their relative competitive positions. For Congress announced that one of the main purposes justifying the making of allotments is "to afford all interested persons an equitable opportunity to market sugar." § 205 (a).

In directing the Secretary to take into consideration ability to market, Congress in effect charged the Secretary with making a forecast of the marketers' capacity to perform in the immediate future. Such a forecast no doubt draws heavily on experience, but history never quite repeats itself even in the vicissitudes of industry. Whether ability to market is most rationally measured by plant capacity or by past performance, whether, if the latter,

the base period should be a year and what year or a group of years and what group—these are not questions to be dealt with as statistical problems. They require a disinterested, informed judgment based on circumstances themselves difficult of prophetic interpretation.

The proper mode of ascertaining "processings of sugar . . . to which proportionate shares . . . pertained" is not here in controversy. Perhaps this factor too implies choice. But the question common to all three standards is whether the Secretary may conclude, after due consideration, that in the particular situation before him it is not essential that each of the three factors be quantitatively reflected in the final allotment formula. Concededly, § 205 (a) empowers the Secretary to attribute different influences to the three factors. Obviously one factor may be more influential than another in the sense of furnishing a better means of achieving a "fair, efficient, and equitable distribution." But it is not consonant with reason to authorize the Secretary to find in the context of the situation before him that a criterion has little value and is entitled to no more than nominal weight, but to find it unreasonable for him to conclude that this factor has no significance and therefore should not be at all reflected quantitatively.

Congress did not predetermine the periods of time to which the standards should be related or the respective weights to be accorded them. In this respect the sugar-quota scheme differs from the quotas designed by Congress for tobacco, wheat, cotton and rice, respectively. See §§ 313 (a), 334 (a), 344 (a) and 353 (a) of the Agricultural Adjustment Act of 1938, 52 Stat. 47, 53, 57, 61, as amended, 7 U. S. C. §§ 1313 (a), 1334 (a), 1344 (a), 1353 (a). Nor do the bare words of § 205 (a) confine the Secretary in the responsible exercise of discretion beyond the limitation inherent upon such delegated authority. He is not free to be capricious, to act without reason, that

is, in relation to the attainment of the objects declared by § 205 (a). The very standards for his conduct, the attainment of "fair, efficient, and equitable distribution" preclude abstract or doctrinaire categories. A variety of plans of allotment may well conform to the statutory standards. But the choice among permissive plans is necessarily the Secretary's; he is the agency entrusted by Congress to make the choice.

These considerations dispose of this phase of the case. We would have to replace the Secretary's judgment with our own to hold that on the record before us he acted arbitrarily in reaching the conviction that the years 1935–1941 furnished a fairer measure of past marketings than the war years 1942–1947. Nor can we hold that it was baseless for him to decide that increased marketings during the war years may be taken to mean improved ability to market but decreased marketings do not justify the opposite conclusion. And it was within his province to exclude from his determination the processings of sugar to which proportionate shares pertained. It is not for us to reject the balance he struck on consideration of all the factors unless we can say that his judgment is not one that a fair-minded tribunal with specialized knowledge could have reached. This we cannot say. We conclude, therefore, that in issuing Order No. 18 the Secretary did not exceed the authority given him by Congress.

II. We must therefore face the challenge to the constitutionality of the Act of 1948. This objection to the order in support of their judgment below is clearly open to respondents in Nos. 27 and 30. The Government of Puerto Rico likewise challenges the constitutionality of the Act. But its status in this litigation raises a distinct issue, consideration of which will be postponed for the moment.

The sugar problem of the country is an old and obstinate one. For fourteen years Congress grappled with it through the mechanism of quotas. Three enactments, culminating in the Sugar Act of 1948, represented an effort to deal with what were deemed to be the harmful effects on interstate and foreign commerce of progressively depressed sugar prices of earlier years created by world surpluses, or, if one prefers it, by the conditions that reflected the imbalance between production and consumption.[6] The legislation presupposes a finding by Congress that producers and marketers of sugar could not adequately respond to market changes merely through the mechanism of a free market and that the public interest, insofar as the Commerce Clause may be drawn upon to meet it, needed controls to supplement and replace the haggling of the market.

Congress might of course have limited its intervention to the raw sugar market, trusting that thereby stability in the refined sugar market would be produced. Congress thought otherwise; it evidently felt that competition among refiners for a legally limited supply of raw sugar, in a period of overexpanded refining capacity,[7] ought not to be left at large. In any event, Congress had the constitutional right to think otherwise and to bring the refining of sugar within its regulatory scheme.

---

[6] The average price per pound of duty-paid raw sugar gradually declined from 6.98 cents in 1923 to 2.80 cents in early 1932. United States Tariff Comm'n, Report to the President on Sugar, Report No. 73, 2d Ser., p. 46. See also Dalton, Sugar, A Case Study of Government Control, cc. IV, V, especially p. 41; 16 Dept. State Bull. 44.

[7] It was estimated that the mainland refineries alone had a capacity in excess of demand of from one-third to one-half. See United States Tariff Comm'n, Report to the President on Sugar, Report No. 73, 2d Ser., p. 91; cf. *Sugar Institute, Inc.* v. *United States*, 297 U. S. 553, 574.

See *Mulford* v. *Smith,* 307 U. S. 38; *United States* v. *Rock Royal Co-operative, Inc.,* 307 U. S. 533; *Wickard* v. *Filburn,* 317 U. S. 111.

It is a commonplace that reforms may bring in their train new difficulties. In any scheme of reform, their prevention or mitigation becomes a proper legislative concern. While ameliorating the effect of disorderly competition, market controls generate problems of their own, not encountered under a competitive system. Such new problems are not outside the comprehensive scope of the great Commerce Clause. Nor does the Commerce Clause impose requirements of geographic uniformity. (Compare Art. I, § 8, cl. 1 and cl. 4.) Congress may devise, as it has done in the Sugar Act of 1948, a national policy with due regard for the varying and fluctuating interests of different regions. See *e. g., Clark Distilling Co.* v. *Western Maryland R. Co.,* 242 U. S. 311; *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.,* 299 U. S. 334; *Prudential Insurance Co.* v. *Benjamin,* 328 U. S. 408. And since the Act of 1948 does not even remotely impinge on any of the specific limitations upon the Commerce Clause (Art. I, § 9, cl. 5 and cl. 6), we are not concerned with the vexing problem of the applicability of these clauses to Puerto Rico. Compare *Downes* v. *Bidwell,* 182 U. S. 244; *Dooley* v. *United States,* 183 U. S. 151; *Alaska* v. *Troy,* 258 U. S. 101; *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, 670, n. 5.

However, not even resort to the Commerce Clause can defy the standards of due process. We assume that these standards extend to regulations of commerce that enmesh Puerto Rico. See *United States* v. *Carolene Products Co.,* 304 U. S. 144, 148–51; *United States* v. *Darby,* 312 U. S. 100, 125–26; *Balzac* v. *Porto Rico,* 258 U. S. 298, 313. The Sugar Act of 1948 is claimed to offend the Due Process Clause of the Fifth Amendment because of the alleged discriminatory character and the oppressive

effects of the refined sugar quota established by the Act. If ever claims of this sort carried plausibility, they seem to us singularly belated in view of the unfolding of the Commerce Clause.

The use of quotas on refined sugar, legislatively apportioned to different geographic areas and administratively allocated to individual beneficiaries, is a device based on the Agricultural Adjustment Act of 1938, 52 Stat. 31, as amended, 7 U. S. C. § 1281 *et seq.,* and sanctioned by this Court in *Mulford* v. *Smith, supra.* The problem which confronted Congress was not the setting of quotas abstractly considered but so to fix their amount as to achieve approximate justice in the shares allotted to each area and the persons within it. To recognize the problem is to acknowledge its perplexities.

Congress was thus confronted with the formulation of policy peculiarly within its wide swath of discretion. It would be a singular intrusion of the judiciary into the legislative process to extrapolate restrictions upon the formulation of such an economic policy from those deeply rooted notions of justice which the Due Process Clause expresses. To fix quotas on a strict historical basis is hard on latecomers into the industry or on those in it who desire to expand. On the other hand, to the extent that newcomers are allowed to enter or old-timers to expand there must either be an increase in supply or a reduction in the quotas of others. Many other factors must plague those charged with the formulation of policy—the extent to which projected expansion is a function of efficiency or becomes a depressant of wage standards; the wise direction of capital into investments and the economic waste incident to what may be on the short or the long pull overexpansion of industrial facilities; the availability of a more suitable basis for the fixing of quotas, etc., etc. The final judgment is too apt to be a hodge-podge of considerations, including considerations

that may well weigh with legislators but which this Court can hardly disentangle.

Suffice it to say that since Congress fixed the quotas on a historical basis it is not for this Court to reweigh the relevant factors and, perchance, substitute its notion of expediency and fairness for that of Congress. This is so even though the quotas thus fixed may demonstrably be disadvantageous to certain areas or persons. This Court is not a tribunal for relief from the crudities and inequities of complicated experimental economic legislation. See *Wickard* v. *Filburn, supra* at 129.

Congress, it is insisted, has not established refined sugar quotas for the mainland refiners as it has for the offshore areas. Whatever inequalities may thereby be created, this is not the forum for their correction for the all-sufficient reason that the extent and nature of inequalities are themselves controversial matters hardly meet for judicial solution. Thus, while the mainland refiners are legally free to purchase and refine all sugar within the raw sugar quota and Puerto Rican refiners are limited to their shares of the refined sugar quota, Congress apparently thought that Puerto Rican refiners operated at costs sufficiently low to insulate them from mainland competition. In addition, it is claimed that since the total supply of raw sugar permitted to enter the mainland market is limited the mainland refiners are in effect also subject to the refined sugar quota, although in contrast to the unchanging quotas of the territories the mainland quota will vary with changes in the total consumer demand. Because this demand tends to be stable, however, the mainland refiners' share of the refined sugar has not, it is urged, greatly expanded during the years when quotas were in effect. Congress might well have thought that relatively minor contractions and expansions in supply from year to year should thus be absorbed.

Plainly it is not the business of judges to sit in judgment on the validity or the significance of such views. The Act may impose hardships here and there; the incidence of hardship may shift in location and intensity. It is not for us to have views on the merits of this legislation. It suffices that we cannot say, as we cannot, that there is "discrimination of such an injurious character as to bring into operation the due process clause." *Currin* v. *Wallace*, 306 U. S. 1, 14. Expressions of dissatisfaction by the Executive and in some quarters of Congress that the refined sugar quotas were "arbitrary," "discriminatory," and "unfair" may reflect greater wisdom or greater fairness than the collective wisdom of Congress which put this Act on the statute books. But the issue was thrashed out in Congress; Congress is the place for its reconsideration.

III. There remains Puerto Rico's right to participate in this litigation. Puerto Rico can have no better standing to challenge the constitutionality of the Sugar Act of 1948 than if it were a full-fledged State. The right of a State to press such a claim raises familiar difficulties. Compare *Massachusetts* v. *Mellon*, 262 U. S. 447; *Florida* v. *Mellon*, 273 U. S. 12; *Jones ex rel. Louisiana* v. *Bowles*, 322 U. S. 707, with *Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230; *New York* v. *New Jersey*, 256 U. S. 296; *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439. Whatever rights Puerto Rico has as a polity, see *Porto Rico* v. *Rosaly*, 227 U. S. 270; *Puerto Rico* v. *Shell Co.*, 302 U. S. 253; *Puerto Rico* v. *Rubert Hermanos, Inc.*, 309 U. S. 543, the Island is not a State. Additional legal questions are raised whether Puerto Rico can press the interests that it is here pressing. In view of the conclusion that we have reached on the constitutional issues which had to be met apart from any jurisdictional question, it would entail an empty discussion to decide whether Puerto Rico

has a standing as a party in this case. It would in effect be merely an advisory opinion on a delicate subject. Since the real issues raised by Puerto Rico have already been decided in Nos. 27 and 30, it becomes unnecessary to decide the question of Puerto Rico's standing to sue. *Wickard* v. *Filburn, supra* at 114, n. 3.

*Nos. 27 and 30 reversed.*
*No. 32 dismissed.*

MR. JUSTICE BLACK would affirm the judgment of the United States Court of Appeals for the District of Columbia Circuit for the reasons given in that court's opinion. 84 U. S. App. D. C. 161, 171 F. 2d 1016.

MR. JUSTICE DOUGLAS took no part in the consideration or disposition of these cases.