**DELBAY PHARMACEUTICALS, INC., Plaintiff,**

v.

**DEPARTMENT OF COMMERCE and Rogers C. B. Morton, Secretary, Department of Commerce, Defendants.**

Civ. No. 76–0056.

United States District Court, District of Columbia.

Feb. 10, 1976.

Memorandum on Motion to Dismiss Feb. 18, 1976.

Peter J. Nickles, Washington, D. C., for plaintiff.

Nicholas S. Nadzo, Atty., Dept. of Justice, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GASCH, District Judge.

This matter is before the Court on plaintiff's motion for preliminary injunction. Upon consideration of the pleadings and submissions of the parties, and the oral argument of counsel, the Court concludes that plaintiff is not entitled to a preliminary injunction. The Court's findings of fact and conclusions of law follow.

### FINDINGS OF FACT

1. Plaintiff, Delbay Pharmaceuticals, Inc., is a Delaware corporation with its principal place of business in Kenilworth, New Jersey. Delbay is a joint venture of the Schering Corporation and Bayer, A. G., a German corporation. Delbay is engaged in the research, manufacture and marketing in the United States of products researched and developed by Bayer, A. G.

2. Defendants are the Department of Commerce and its Secretary. The

Department of Commerce is charged with the enforcement of the Endangered Species Act of 1973.

3. The plaintiff seeks to enjoin the defendants from enforcing the provisions of the Endangered Species Act of 1973, 87 Stat. 884, 16 U.S.C. § 1531 *et seq.* (hereinafter "the 1973 Act") with regard to the sale in interstate commerce of parts or products of endangered species legally held in the United States on December 28, 1973. Specifically, plaintiff claims that the prohibitions in the 1973 Act pertaining to receipt of, or interstate commerce in, parts or products of endangered species do not apply to such parts or products legally held for commercial purposes in the United States on the effective date of the 1973 Act, to wit, December 28, 1973, or, in the alternative, that such prohibitions do not apply to successors in interest in products imported under an economic hardship permit issued pursuant to the Endangered Species Conservation Act of 1969, Pub.L.No. 91–135, 83 Stat. 275 (hereinafter "the 1969 Act").

4. In December, 1969, the Congress enacted the 1969 Act. This law prohibited the *importation* of endangered species; however, Section 3(b) of the Act authorized the Secretary of the Interior to issue import permits

> "In order to minimize undue economic hardship to any person importing any species . . . which are determined to be threatened with worldwide extinction . . . under any contract entered into prior to the date of publication of such determination in the Federal Register . . . ."

5. On December 28, 1973, the Congress enacted the 1973 Act. This statute is far broader than the provisions of the 1969 Act, which were specifically repealed by Section 14 of the 1973 Act. The 1973 Act prohibits not only importation of endangered species, 16 U.S.C. § 1538(a)(1)(A), but also makes it unlawful to "sell or offer for sale in interstate or foreign commerce" an endangered species, 16 U.S.C. § 1538(a)(1)(F), or to "deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of commercial activity" an endangered species, 16 U.S.C. § 1538(a)(1)(E). These prohibitions extend to parts or products of "fish or wildlife" (whether dead or alive) that are designated as "endangered species." 16 U.S.C. § 1532(5).

6. The plaintiff is engaged in the manufacture for shipment and sale, in interstate commerce, of a prescription drug, Lotrimin. Lotrimin is a synthetic antifungal agent which inhibits the growth of pathogenic dermatophytes, yeasts and *Malassezia furfur.* Lotrimin is available in both cream and solution form. Lotrimin is the sole marketed product of plaintiff and is the result of approximately six years of research and the expenditure of approximately five million dollars.

7. Lotrimin cream contains spermaceti, a waxy substance derived from the sperm whale. The sperm whale was initially listed as an endangered species, pursuant to the provisions of the 1969 Act on December 2, 1970, in the Federal Register, Volume 35, at page 18319. The list of endangered species has been codified in the Code of Federal Regulations, Title 50, at Section 17.11.

8. The spermaceti utilized by the plaintiff in the manufacture of Lotrimin cream was purchased from the Werner G. Smith Company throughout the period 1974–1975. The spermaceti had been legally imported into the United States under Permit No. ES–50 issued to the Werner G. Smith Company, pursuant to the economic hardship exception to the 1969 Act at Section 3(b), formerly 16 U.S.C. § 668cc–3(b). The permit which was dated January 29, 1971, and expired on December 1, 1971, allowed the Werner G. Smith Company to import 3,070 long tons of oil of the sperm whale.

9. On December 19 and 23, 1975, pursuant to the enforcement provisions of the 1973 Act, 16 U.S.C. § 1540(e), agents of the National Marine Fisheries Service of the Department of Commerce seized plaintiff's inventory of spermaceti, in-

cluding all Lotrimin cream containing spermaceti.

10. The inventory of Lotrimin cream seized by the defendants consisted of 325,791 15-gram tubes and 175,281 30-gram tubes for sale purposes and 528,617 two-gram tubes to be used as samples. In addition, the inventory included approximately 45,000 kits containing assorted numbers of two-gram tubes. Plaintiff's inventory of bulk spermaceti consisted of approximately 287 kilos.

11. Plaintiff's sales of Lotrimin cream comprise 70 percent of all its sales, and the value of the company's inventory of Lotrimin cream seized by defendants is approximately $1,500,000 and the value of the spermaceti seized by defendants is approximately $224.

12. In December, 1975, the Food and Drug Administration (FDA) approved for marketing a competing product, Micatin, sold by Johnson & Johnson. Until the FDA's approval of an expanded spectrum for Micatin, Lotrimin had a broader approved spectrum than any other topical product for treatment of such a wide range of fungal infections.

13. Since the seizure, plaintiff has produced Lotrimin cream containing synthetic spermaceti that is otherwise identical in all respects to Lotrimin cream containing natural spermaceti. Plaintiff was expected to produce approximately 75,000 tubes of Lotrimin cream containing synthetic spermaceti by January 23, 1976. Plaintiff alleges that the seizure of its inventory has required complete suspension of its sales and promotional activities, namely, providing samples of Lotrimin cream to physicians, at a time when its competitor has just entered the market and is heavily promoting its own new drug.

## MOTION FOR PRELIMINARY INJUNCTION

It is plaintiff's contention on this motion that since its spermaceti was legally imported pursuant to a hardship exemption permit, its spermaceti is forever exempt from any restriction then in effect or that might thereafter be enacted. Therefore, it argues that the 1973 Act, enacted after its spermaceti was legally in the country, can have no effect on the subsequent use of this spermaceti. The 1973 Act can have only prospective application, it is argued, absent a clear and manifest Congressional intent to apply the statute retrospectively.

Further plaintiff argues that the hardship exemption permit gave to the Werner G. Smith Company (and Delbay as successor in interest), not only the right to import spermaceti, but also the right to sell in interstate commerce the spermaceti legally imported. It is plaintiff's position that defendants by applying the 1973 Act to its spermaceti have divested it of this latter substantive right, contrary to the intent of Congress. It contends it was the intent of Congress in the 1973 Act to protect *existing* endangered and threatened species. 16 U.S.C. § 1531(b). Thus plaintiff argues there can be no purpose in outlawing spermaceti legally held in this country on the date of enactment of the 1973 Act.

These arguments misinterpret both the 1969 Act and the 1973 Act. The Endangered Species Conservation Act of 1969, §§ 1–6 of Pub.L. 91–135, dealt only with the prohibition against *importation* of *endangered species.* Section 7 of Pub.L. 91–135 amended the Lacey Act, 18 U.S.C. § 43, to provide civil and criminal penalties for the interstate shipment of *any* wildlife "taken" contrary to law.

Thus the primary weakness in plaintiff's position is its contention that the import permit granted it rights beyond the mere right to import the spermaceti. This is simply not the case. The only activity prohibited by the 1969 Act was the *importation* of endangered species. Therefore any exemption to the 1969 Act granted *only* the right to import. If this were not the case, then one importing spermaceti pursuant to a hardship exemption would be placed in a superior position to one who had lawfully imported spermaceti prior to the enactment of the 1969 Act. This certainly was not the intent of Congress. Nor is this applica-

tion of the prohibitions of the 1973 Act to plaintiff's spermaceti a retrospective operation of the statute. Plaintiff's spermaceti has not been seized and plaintiff will not be subject to criminal or civil sanctions because of any activities prior to December 28, 1973, the date of enactment of the 1973 Act. It is only activities occurring after that date that are subject to the prohibitions of the 1973 Act. Thus the Act is being applied prospectively only.

As to plaintiff's contention that Congress in enacting the 1973 Act did not intend to restrict the use of spermaceti already in the country, this again misinterprets Congressional intent. The 1973 Act is a comprehensive effort to focus all available resources of the federal and state governments towards the goal of protecting endangered species and the ecosystems on which they depend. See H.R.Rep.No.412, 93d Cong., 1st Sess. 4–10 (1973). Congress realized that its prior legislation was no longer adequate. *Id.* at 6. The need for aggressive action by federal and state authorities was recognized:

> Any program for the protection of endangered species must necessarily concern itself with more than a simple "hands-off" attitude toward the animals and plants themselves.
>
> Such an attitude lies at the heart of the legislation here presented to the House. . . .

*Id.* In describing the prohibited acts provision of the 1973 Act, the House Report states, "[i]t includes, in the *broadest possible* terms, restrictions on the taking, importation and exportation, and transportation of such species . . . ." *Id.* at 15 (emphasis added). See also S.Rep. No.1136, 92d Cong., 2d Sess. 10 (1972). In drafting a "grandfather clause" exemption to the prohibitions of the 1973 Act, the Congress was aware of the difficulties in the enforcement of the Act that would result if the clause were too broadly worded. So a compromise provision created an exemption in the form of an affirmative defense with respect to

*noncommercial* activities. Beyond this narrow exemption it is clear that Congress desired the broadest possible application of the Act's prohibitions in order to facilitate the Act's enforcement. See H.R.Rep.No.740, 93d Cong., 1st Sess. 27 (1973).

As evidence of this desire, the provisions of Section 4(e) of the 1973 Act stand out. This section provides that when an endangered species so closely resembles a species not listed as endangered so as to create a substantial difficulty in differentiating between the listed and unlisted species, the unlisted species may be treated as an endangered species in order to "facilitate the enforcement and further the policy of [the Act]." 16 U.S.C. § 1533(e). This provision emphasizes Congress' intent that Federal agencies be given the broadest possible authority in order to carry out the objectives of the Act.

It is just such considerations that may justify the seizure of plaintiff's spermaceti. There may indeed be difficulty in distinguishing between lawfully imported spermaceti and illegally imported spermaceti. If plaintiff's spermaceti were allowed to enter interstate commerce, it could greatly increase the enforcement difficulties. A total ban is easier to enforce than a partial ban. If there were a continued market in this country for spermaceti, it might encourage the illegal taking of sperm whales to supply this market. A total ban may also encourage the search for other products, both natural and synthetic, to replace those derived from endangered species. This too will discourage the illegal taking of such species. It is clear that Congress intended to extend the prohibitions of the 1973 Act to their widest possible reach and that the extension of such prohibitions to include plaintiff's spermaceti may well serve the Congressional intent in enacting the 1973 Act.

On the basis of the above discussion the Court adopts the following

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

2. For a preliminary injunction to issue, plaintiff must demonstrate (1) a reasonable probability it will prevail on the merits, (2) an imminent and irreparable harm to itself unless the injunction is granted, (3) an absence of substantial harm to other interested parties, and (4) an absence of harm to the public interest. *Virginia Petroleum Job. Ass'n v. Federal Power Comm'n,* 104 U.S.App. D.C. 106, 110, 259 F.2d 921, 925 (1958).

3. The Endangered Species Conservation Act of 1969 prohibited only the *importation* of endangered species. It did not prohibit any commercial activity with regard to endangered species legally imported into or otherwise legally held in the United States.

4. The provisions of Permit No. ES–50 issued to the Werner G. Smith Company, pursuant to the economic hardship exception provision in the 1969 Act allowed the importation of spermaceti for the period stated in such permit. Granting of the permit did not convey any rights beyond the right to import. Thus, even if plaintiff succeeded by operation of law to the right conveyed to the Werner G. Smith Company with regard to the spermaceti obtained by plaintiff, such right is unrelated to the provisions of the Endangered Species Act of 1973 and does not render the 1973 Act inapplicable as to plaintiff.

5. Fish or wildlife imported pursuant to a permit issued under the 1969 Act and held in the course of commercial activity on the date of enactment of the 1973 Act are subject to all the provisions of the 1973 Act.

6. The spermaceti held by the Werner G. Smith Company on December 28, 1973, in the course of a commercial activity and imported pursuant to an economic hardship exception permit under the 1969 Act is subject to all the provisions of the 1973 Act.

7. The actions of defendants in seizing plaintiff's Lotrimin and bulk spermaceti were within their statutory authority as granted by the 1973 Act.

8. Plaintiff has failed to show a reasonable probability it will prevail on the merits.

9. There is a danger of harm to the public interest if defendants' enforcement efforts are curtailed by the issuance of a preliminary injunction.

10. Plaintiff has not shown that any harm it may suffer if an injunction is not entered cannot be adequately compensated by money damages, if it ultimately prevails on the merits.

11. Plaintiff is not entitled to the issuance of a preliminary injunction.

## MEMORANDUM ON MOTION TO DISMISS

The defendants seek a dismissal of this action on the ground that the complaint fails to state a claim upon which relief can be granted. The factual and legal background of this case is set forth in the Court's Findings of Fact and Conclusions of Law entered on February 10, 1976, which are hereby incorporated by reference into this Memorandum.

The Court has denied plaintiff's request for preliminary injunctive relief, finding specifically that the actions of the defendants were within the statutory authority granted by the Endangered Species Act of 1973, 87 Stat. 884, 16 U.S.C. § 1531 *et seq.* (hereinafter "the 1973 Act"). Plaintiff in the Second Claim in its Complaint alleged that in the event the Court finds that the defendants have not acted in excess of their statutory authority, then the 1973 Act violates plaintiff's rights under the Fifth Amendment to the Constitution in that Congress' classification and scheme of regulation bear no real or rational relationship to the purposes for which the statute was passed. Plaintiff requested that the Court convene a statutory three-judge court pursuant to 28 U.S.C. §§ 2282, 2284, to consider the constitutionality of the Act.

Plaintiff's constitutional claim rests on an alleged violation of the due process clause of the Fifth Amendment. Since the beginning of this century, the

Supreme Court, with few exceptions since overruled, has consistently upheld the power of Congress under the Commerce Clause to exclude from the channels of interstate commerce those products whose movements between the states the Congress deems harmful to the national welfare. *See, e. g., Reid v. Colorado,* 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108 (1902); *Hipolite Egg Co. v. United States,* 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364 (1911); *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). As relevant to the case at bar, this judicial deference to Congressional action under the Commerce Clause is checked only by the due process requirement that the action not be arbitrary. *Secretary of Agriculture v. Central Roig Refining Co.,* 338 U.S. 604, 616, 70 S.Ct. 403, 94 L.Ed. 381 (1950).

As discussed in the Court's Findings of Fact and Conclusions of Law, filed in this case on February 10, 1976, Congress may well have had a rational basis for bringing the spermaceti held by plaintiff (as successor in interest to the Werner G. Smith Company) within the statutory prohibitions of the 1973 Act. The effective enforcement of the prohibitions of the 1973 Act was a major consideration of the Congress. The difficulties in enforcement that would result if trafficking in "legally imported" endangered species were allowed while contraband endangered species were to be excluded from interstate commerce, could be mon-

umental. As the Court stated in its earlier Findings of Fact and Conclusions of Law, a total ban is easier to enforce than a partial ban. Additionally, if there continued to be a market for "legally imported" spermaceti, it might encourage the illegal taking of sperm whales, a result contrary to the basic goal of the 1973 Act. And, of course, a total ban would encourage the rapid development of substitutes for the products derived from endangered species.[1]

■ These are legitimate and rational considerations. Congress might well have deemed them to be reason enough to extend the prohibitions of the 1973 Act to products such as plaintiff's spermaceti. It is not for this Court or any court to question the wisdom of these legislative decisions.

> It was for Congress to make the choice of the means by which its objective . . . was to be secured, and its judgment . . . is not open to review here.

*Virginian Railway Co. v. System Federation No. 40,* 300 U.S. 515, 553, 57 S.Ct. 592, 81 L.Ed. 789 (1937); see also *Secretary of Agriculture v. Central Roig Refining Co.,* 338 U.S. 604, 619, 70 S.Ct. 403, 94 L.Ed. 381 (1950). Once it is found that the means chosen are appropriate to a permissible end and are neither arbitrary nor patently discriminatory, there is little scope for the operation of the due process clause. *Nebbia v. New York,* 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940 (1934).[2] Dissatisfaction

---

1. To the extent that the Court's interpretation of Congressional intent in enacting the 1973 Act is different from that of the Court of Appeals of New York in *A. E. Nettleton Co. v. Diamond,* 27 N.Y.2d 182, 315 N.Y.S.2d 625, 264 N.E.2d 118 (1970), *appeal dismissed* 401 U.S. 969, 91 S.Ct. 1201, 28 L.Ed.2d 319 (1971), interpreting New York State's legislation forbidding commerce in endangered species, the Court need only note that the considerations of Congress dealing with a nationwide and worldwide problem may have materially differed from those of the New York legislature. Given these differences and considering the greater power to regulate interstate commerce given the federal government, the Court sees no conflict between its position and that of the New York court.

2. *See Century Arms, Inc. v. Kennedy,* 323 F.Supp. 1002 (D.Vt.), *aff'd* 449 F.2d 1306 (2d Cir. 1971), *cert. denied,* 405 U.S. 1065, 92 S.Ct. 1494, 31 L.Ed.2d 794 (1972). In this case plaintiff, a gun importer, had contracted to import surplus military firearms. Pursuant to a federal statute it had requested and received import licenses for these firearms from the federal government. The firearms arrived in the United States before the expiration of the licenses. Prior to the arrival, however, Congress had enacted new legislation which prohibited the importation of all surplus military firearms. Plaintiff was therefore refused permission to bring the firearms into the country despite its import licenses. The court held that this was not a denial of due process since Congress' action in prohibiting such importa-

with the Congressional response to the problem of endangered species may well be justified. But that response was a legitimate legislative action; Congress is the forum to which such dissatisfaction should be addressed.[3]

■ A three-judge court need not be convened if the constitutional claims are "obviously without merit" or if their "unsoundness so clearly results from the previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy." *Ex Parte Poresky,* 290 U.S. 30, 32, 54 S.Ct. 3, 4, 78 L.Ed. 152, 153 (1933); *Bulluck v. Washington,* 152 U.S.App.D.C. 39, 44, 468 F.2d 1096, 1101 (1972).

■ The discussion above recognizes the judicial deference paid to Congressional power under the Commerce Clause, even in light of the due process limitations of the Fifth Amendment, and indicates the "unsoundness" of plaintiff's constitutional claims in light of the Supreme Court's decisions. Therefore, a three-judge court will not be convened.

■ Having determined that defendants have not exceeded their statutory authority under the Endangered Species Act of 1973 and that the Act does not violate the Fifth Amendment of the Constitution, the Court finds that plaintiff's Complaint fails to state a claim upon which relief can be granted. Accordingly, defendants are entitled to a dismissal of this action.

---

tion was not unreasonable, arbitrary or capricious as a matter of law. The court also held that this was not an appropriation of property without just compensation. The court stated:

> Thus we find insubstantial plaintiff's argument that once the federal government issues a license, and the license is relied upon, the license can never be revoked consistent with due process of law, until it should expire by its own terms.

*Id.* at 1017.

3. Plaintiff has drafted its Fifth Amendment argument in terms of the arbitrariness of the 1973 Act. The other due process consideration is whether the Act involves a taking of private property without just compensation. To the extent this may be a consideration here, plaintiff has an adequate remedy at law in the Court of Claims by way of a suit under the Tucker Act, 28 U.S.C. § 1491.