# United States Court of Appeals for the Federal Circuit

04-1269

CAROLINA TOBACCO COMPANY,

Plaintiff-Appellant,

v.

BUREAU OF CUSTOMS AND BORDER PROTECTION
(formerly known as United States Customs Service),

Defendant-Appellee.

Paul G. Dodds, Brownstein, Rask, Sweeney, Kerr, Grim, DeSylvia & Hay, LLP, of Portland, Oregon, argued for plaintiff-appellant.

Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Patricia M. McCarthy, Assistant Director.

Appealed from: United States Court of International Trade

Senior Judge R. Kenton Musgrave

# United States Court of Appeals for the Federal Circuit

04-1269


CAROLINA TOBACCO COMPANY,

Plaintiff-Appellant,

v.

BUREAU OF CUSTOMS AND BORDER PROTECTION,
(formerly known as United States Customs Service),

Defendant-Appellee.

_____

DECIDED:  April 4, 2005

_____


Before NEWMAN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

An importer challenges the United States Customs Service's ("Customs'") increase in the amount of its import bond to reflect the importer's substantial increase in its imports.  The importer contends that in increasing its bond, Customs did not comply with the applicable regulatory requirements.  The Court of International Trade upheld Customs' action.  Carolina Tobacco Co. v. United States Customs Serv., No. 03-00123 (Ct. Int'l Trade Mar. 4, 2004) ("Slip Op.").  We affirm.

I

The underlying facts are simple and undisputed. The appellant Carolina Tobacco Company ("Carolina") has been manufacturing and importing "value priced" cigarettes since 1998, and has had a continuous entry bond in place since early 1999. Slip Op. at 2-3. Such a bond permits an importer to continuously enter merchandise and pay the duties, taxes and fees owed upon a number of entries at a later date. The bond thus secures against revenue loss for what is, in effect, an interest-free line of credit the importer has with the government during the period between entry and payment. (Appellee's Br. at 11.)

Carolina pays its customs duties and taxes weekly by electronic funds transfer, and has never had any unpaid, underpaid, or incorrectly paid duties or taxes. Slip Op. at 3; Redmond Aff. at ¶ 10 (testimony of Carolina's President and Managing Director).

Customs originally set Carolina's bond at $80,000, based on Carolina's statement that in 1999-2000 it expected to make dutiable entries totaling $500,000 and duty-free entries totaling $5,000,000. Carolina's imported tobacco products increased to $8.2 million in 2000-2001, and $13.8 million in 2001-2002. Although Customs regulations require an importer to update its continuous bond application within 30 days "whenever there is a significant change" in the information provided in its previous application, 19 C.F.R. § 113.12(b)(2), Carolina never updated its bond application to reflect the significantly increasing value of its imports and the corresponding increases in its duty and tax liability. Slip Op. at 3.

In late 2002, Customs notified Carolina that its continuous entry bond of $80,000 had been "determined to be inadequate to ensure compliance with Customs law and

regulations[,]" and that within sixty days Carolina must either terminate it and replace it with a $3,000,000 bond, or submit a single transaction bond and deposit estimated duties with each entry. Letter from Customs to Carolina (Sept. 17, 2002); Slip Op. at 3. Carolina then sought to negotiate a lower bond based on its particular circumstances including excellent payment history, weekly payment schedule, value of available inventory, and other factors that it contended reduced the risk of revenue loss.

Carolina's attempts to negotiate a lower bond with Customs were unsuccessful. In rejecting Carolina's request for a reduced bond "after extensive deliberation of this issue," Customs stated that it "bas[ed its] analysis on a number of factors, including, but not limited to the imported merchandise and associated risk assessment, industry standards, [Carolina's] past and anticipated import values and the equitable expectations and treatment of all importers in this industry." Letter from Customs to Carolina (Feb. 3, 2003) ("Letter of Feb. 3, 2003"), at 1; see also Letter from Customs to Carolina (Mar. 20, 2003) ("Letter of Mar. 20, 2003") (explaining increase in bond was required "due to the volume of [Carolina's] business, the value and type of merchandise, pursuant to Customs Regulations 113.13 (19CFR 113.13) [sic] and the bond sufficiency guidelines").

Carolina then filed suit in the Court of International Trade to enjoin Customs from requiring it to replace its existing bond with a bond of more than $80,000 "without considering the factors specified in 19 C.F.R. § 113.13" (discussed below) and "from demanding that plaintiff procure a new continuous bond in an amount in excess of an amount reasonably necessary to ensure plaintiff's compliance with applicable customs laws and regulations." Complaint (Mar. 28, 2003) at ¶ 15. Carolina claimed that

Customs "failed to consider the factors specified by 19 C.F.R. § 113.13 and appears to have applied general guidelines rather than consider facts specific to [Carolina,]" that "[a] continuous bond of $3,000,000 far exceeds the amount necessary to ensure [Carolina's] compliance with applicable customs laws and regulations[,]" and that the bond increase was "unreasonable, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law." Id. at ¶¶ 10-12.

The Court of International Trade granted Customs' motion for judgment on the administrative record. As the court pointed out, Carolina's basic argument was that Customs, by applying its internal directive (also discussed below) that bonds should be set to at least 10 percent of the amount of the duties, taxes and fees paid by the importer in the previous year, violated the requirement in the regulatory guidelines that Customs should consider six specified factors when setting bond. Carolina argued that the regulation of 19 C.F.R. § 113.13(b) "mandate[d] an individualized assessment of each importer and its activity rather than application of a generalized formula." Slip Op. at 5-6. In rejecting this argument, the court stated:

> Although the guidelines set forth by 19 C.F.R. § 113.13 and the instructions contained in Customs Directive 99-3510-04 appear to contemplate different schemes for establishing an importer's bond requirement, the methodologies are not necessarily inconsistent. The Court is satisfied with Customs' explanation that, due to the lag time before it could stop an importer from withdrawing merchandise for consumption, a 10 percent bond is a necessary minimum amount of protection for the revenue. Moreover, the Court finds reasonable Customs' explanation at oral argument of the interplay between the Directive and the Regulation, namely that the 10 percent bond is required when the importer has a favorable review under 19 C.F.R. § 113.13 and an even higher bond would be required if analysis under these guidelines indicated that the importer posed a greater risk to the revenue.

Slip Op. at 6-7 (internal citation omitted).

Carolina's case turns on the interpretation and interrelationship of two sets of "guidelines" promulgated by Customs covering its determination of the amount of importers' bonds. The first, adopted as a formal regulation following notice and opportunity for comment, provides the following:

> (b) Guidelines for determining amount of bond. In determining whether the amount of a bond is sufficient, the port director . . . should at least consider:
>
> (1) The prior record of the principal in timely payment of duties, taxes, and charges with respect to the transaction(s) involving such payments;
>
> (2) The prior record of the principal in complying with Customs demands for redelivery, the obligation to hold unexamined merchandise intact, and other requirements relating to enforcement and administration of Customs and other laws and regulations;
>
> (3) The value and nature of the merchandise involved in the transaction(s) to be secured;
>
> (4) The degree and type of supervision that Customs will exercise over the transaction(s);
>
> (5) The prior record of the principal in honoring bond commitments, including the payment of liquidated damages; and
>
> (6) Any additional information contained in any application for a bond.

19 C.F.R. § 113.13(b) (1999).

Prior to promulgating this regulation, Customs received requests during the notice and comment period that it codify a consistent bond formula, and explained that it would do so by issuing directives. Indeed, Customs noted that "[v]irtually every commenter expressed concern with the provisions of proposed § 113.13(b) relating to guidelines for determining the amount of the bond. While they did not object to the proposed language of the section, it was the general consensus that specific monetary

amounts or a specific formula should be used to determine the bond amount. . . . Based upon the commenter's concerns Customs will formulate specific guidelines to be used in conjunction with those set forth in proposed § 113.13(b)."  Customs Bond Structure; Revision, 49 Fed. Reg. 41152, 41154 (Oct. 19, 1984).  Customs then issued an internal directive, Customs Directive 99-3510-004, Monetary Guidelines for Setting Bond Amounts (issued July 23, 1991) (the "Directive"), which stated, in pertinent part, the following "Guidelines for Determining Amounts of Bonds":

> Activity 1 – Importer or Broker – Continuous
> The bond limit of liability amount shall be fixed in an amount the district director may deem necessary to accomplish the purpose for which the bond is given.  The non-discretionary bond amount minimum is $50,000. To assist the district director in fixing the limit of liability amount, the following formula shall be used.
>
> None to $1,000,000 duties and taxes – the bond limit of liability amount shall be fixed in multiples of $10,000 nearest to 10 percent of duties, taxes and fees paid by the importer or broker acting as importer of record during the calendar year preceding the date of the application.
>
> Over $1,000,000 duties and taxes – the bond limit of liability amount shall be fixed in multiples of $100,000 nearest to 10 percent of duties, taxes and fees paid by an importer or broker acting as importer of record during the calendar year preceding the date of the application.
>
> In either of these two categories a bond may be demanded with a limit of liability amount greater than that computed using this formula, provided sufficient evidence of high risk is on-hand to support the higher amount.

Id. at 3-4.

Carolina contends that by adopting the six specific "Guidelines for determining the amount of bond," the Section 113.13(b) regulation requires Customs to base the amount of the bond upon "an individualized assessment" of the situation of each particular importer, and that Customs' use of the 10 percent minimum specified in its internal Directive is invalid because it is inconsistent with the regulation's guidelines.

04-1269                                6

Except for this contention, Carolina does not challenge Customs' authority to adopt a numerical formula for the minimum amount of bonds.

Carolina's argument has several fatal flaws:

A. The Section 113.13(b) regulation provides "Guidelines for determining amount of bond." Guidelines are just that. They provide suggested standards for government officials to use in performing their duties. They do not impose explicit requirements, but merely indicate appropriate courses for the officials to follow.

This court dealt with a similar situation in reviewing a penalty imposed for employee misconduct. The employee contended that the sanction was unreasonable because it exceeded that specified in the agency's table of penalties for the particular offense. In rejecting that contention, we pointed out that the table of penalties stated that it was a "guide," and therefore did not preclude the agency from imposing the more severe penalty that it deemed appropriate in the particular case. Weston v. United States Dep't of Housing & Urban Dev., 724 F.2d 943, 950 (Fed. Cir. 1983); see also Farrell v. Dep't of Interior, 314 F.3d 584, 591-92 (Fed. Cir. 2002) (citing Daub v. United States, 292 F.2d 895, 897 (Ct. Cl. 1961)) (dealing with tables of penalties); cf. Brehmer v. Fed. Aviation Admin., 294 F.3d 1344, 1348 (Fed. Cir. 2002) (stating that an agency's "policy" "indicates the standards an agency generally will follow" but "is not, however, a black letter rule that the agency is required to follow"). By the same reasoning, the Section 113.13(b) regulation does not require Customs to consider the six specified factors before setting an importer's bond at the 10 percent level.

B. Since both the Section 113.13(b) regulation and the Directive were promulgated by Customs, it is appropriate to consider that agency's intent and purpose

in adopting them. There is nothing in the language or history of those provisions that even suggests, let alone establishes, that Customs intended them to require the kind of "individualized assessment" of a particular importer's situation that Carolina interprets the regulation to require.

In its brief and at oral argument, the government explained that Customs' regular practice is to set the bond at 10 percent of the importer's prior year's activity, and then use the factors in the regulation to determine whether a higher bond is required for a particular importer in order to protect the revenue. The Directive itself states that higher bonds than the formula would produce "may be demanded."

This approach is consistent with Customs' indication, prior to promulgating the regulation, that it had been asked to provide a consistent bond formula and that it would do so through directives. It also is consistent with the language of the regulation that the port director should consider the factors "[i]n determining whether the amount of a bond is sufficient." As we recently stated, "it is well settled that an agency's interpretation of its own regulations is entitled to broad deference from the courts." Cathedral Candle Co. v. United States Int'l Trade Comm'n, No. 04-1083, 2005 WL 545190 (Fed. Cir. Mar. 9, 2005) (citing Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)). Customs' interpretation of its own regulation is entitled to substantial weight. We see no reason to reject it.

C. Even if the Section 113.13(b) regulation required some individualized consideration by Customs of the six factors before setting the amount of the bond, Carolina has not shown that Customs failed to give such consideration in this case.

The regulation states that "[i]n determining whether the amount of a bond is sufficient," the port director "should at least consider" the six factors. The statement that the director should "consider" the factors "impl[ies] wide areas of judgment and therefore of discretion." Sec'y of Agric. v. Cent. Roig Refining Co., 338 U.S. 604, 611-14 (1950) (holding that Secretary had wide discretion in making quota allotments where Congress directed him to "tak[e] into consideration" particular factors); see also Brehmer, 294 F.3d at 1348 ("The statement in the collective bargaining agreement that 'consideration should be given' to non-disciplinary measures did not require the Administration to eschew discipline in every situation."). In considering the factors, the port director may give them whatever weight he deems appropriate; he may conclude that particular factors should be given no weight whatsoever. Cent. Roig, 338 U.S. at 613.

Government officials are presumed to do their duty, and one who contends they have not done so must establish that defect by "clear evidence." United States v. Armstrong, 517 U.S. 456, 464 (1996); United States v. Chem. Found., Inc., 272 U.S. 1, 14-15 (1926). Carolina has not carried that burden. Just as a district court's failure to discuss an issue does not necessarily establish that the court did not consider it, see, e.g., Lab. Corp. of Am. Holdings v. Chiron Corp., 384 F.3d 1326, 1332 (Fed. Cir. 2004), so the failure of Customs to explicitly discuss the six factors when it initially increased Carolina's bond does not establish that it did not consider them.

Indeed, in its first letter explaining why it would not reduce the amount of the increased bond, Customs stated that it based its analysis "on a number of factors," several of which included the factors listed in the regulation. Customs thus did consider

Carolina's particular situation before its decision to increase the bond finally became operative.

## CONCLUSION

The judgment of the Court of International Trade is

<u>AFFIRMED</u>.